899 A.2d 189

**Florence Anjola GRINER**

v.

**STATE of Maryland.**

**No. 1580, Sept.Term, 2004.**

Court of Special Appeals of Maryland.

May 25, 2006.

716

718

Bradford C. Peabody (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Steven L. Holcomb (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before SALMON, DEBORAH S. EYLER and MEREDITH, JJ.

SALMON, J.

Florence Anjola Griner was convicted by a jury sitting in the Circuit Court for Montgomery County of four counts of second degree assault. She was sentenced to nine months incarceration on one count. The remaining counts were merged for sentencing purposes. Ms. Griner noted a timely appeal and presents two questions for our review:

I.   Did the trial court err in denying her motion to suppress her statements to the police?

II.  Did the trial court err in granting the State's motion to admit out-of-court statements attributable to the child-victim?

## *BACKGROUND*

Prior to trial, appellant moved to suppress the statements she made to various police officers. In addition, the State requested a hearing, under Section 11–304 of the Criminal

Procedure Article of the Maryland Code (2001),[1] concerning the admissibility of the out-of-court statements made by the child-victim.

To address these motions, the court conducted a hearing, which lasted two days.

In Part I.A, *infra,* we shall recount the evidence presented at that hearing.

## I.

### A.

On January 9, 2003, at approximately 10:00 a.m., Montgomery County Police Officers Rosalyn Mills and Maquetta Blackstone responded to the area of Fenwick Lane and First Avenue in Silver Spring in response to a request that they check on the welfare of a child. Upon arrival, the officers came upon appellant and her grandson, Chase P., who was four-years and eight-months old. The child's right eye was swollen and partially shut. A laceration above the eye had been stitched.

Officer Mills asked appellant what happened to Chase and she responded that he fell at a skating rink in Wheaton. Appellant also said that Chase had received medical attention. When Blackstone asked which hospital Chase had been taken to, appellant became "very agitated" and professed an inability to recall that detail.

Initially, appellant indicated that she did not want the officers to speak with Chase alone. After five to seven minutes, appellant relented and let Officer Mills talk to Chase while Officer Blackstone continued to speak with appellant.

Officer Mills, who was in uniform and armed when she questioned appellant, testified that during the interview appellant was always free to leave at any time and take Chase with

---

1. Section 11–304 permits admission in a criminal proceeding of the out-of-court statements made by certain child victims if numerous conditions are met.

her. The officer, however, did not inform appellant of this fact. On the other hand, Mills never informed appellant that she could not leave. Moreover, she never prevented appellant from leaving. According to Mills, appellant never asked to leave, nor did Mills ever threaten appellant or put her hands on appellant.

Officer Blackstone corroborated Officer Mills's testimony. She testified that appellant did not try to leave or run away when the officers first approached her. According to Blackstone, neither officer put her hands on appellant or told her that she was not free to leave, nor did appellant indicate that she wished to leave.

Chase initially told Mills that he had fallen, but the officer believed that what Chase said and what appellant said were inconsistent, so Mills again asked appellant what happened to Chase's eye. Appellant again responded that Chase had fallen, adding that he had fallen on a step.

Because Officer Mills did not believe Chase's injury was consistent with his having fallen on a step, she asked Chase if he had gone to the doctor to be treated for his eye. Chase replied that he had not gone to a doctor but that appellant had stitched his wound. Officer Mills then called for an ambulance to have paramedics examine the eye.

After the ambulance arrived, appellant was informed that the paramedics were taking Chase to Holy Cross Hospital. According to Officer Blackstone, appellant made no response when so informed. Blackstone told appellant that she could follow Chase to the hospital in her vehicle, which she did.

Corporal Douglas Cobb arrived on the scene after Chase had been transported to the hospital, but before appellant left. The corporal first spoke with Officers Mills and Blackstone. He then spoke with appellant for about five minutes and found her to be cooperative. He informed her that the police were there to investigate a possible child abuse case. When the corporal inquired into Chase's injuries, appellant responded that he had fallen outside a skating rink in Wheaton, that his eye was swollen, and that he had not received any medical

attention. The corporal asked if Chase had any other injuries and appellant stated that he had cut his hand that day.

Corporal Cobb asked appellant what type of discipline she used. She replied that she would hit Chase on his legs with a "switch" or a "small stick." She denied, however, that she ever hit him anywhere else.

Corporal Cobb did not advise appellant of her *Miranda* rights. He never told her that she was not free to leave, never placed his hands on her, and never physically restrained her. Appellant gave no indication that she wished to speak to an attorney during the interview.

Officer Blackstone drove to the hospital and waited in the lobby with appellant. During this interlude, appellant informed Officer Blackstone that she had a nursing background and that she had stitched up Chase's eye after numbing it with ice. According to Officer Blackstone, appellant was not restrained or under arrest and did not ask for an attorney. Blackstone did not advise appellant of her *Miranda*[2] rights because appellant was not under arrest. Officer Blackstone testified that she did not threaten appellant or offer her any inducements or rewards in exchange for appellant's agreeing to speak with her.

Saskia Inwood, a licensed social worker employed by Montgomery County Child Welfare Services, arrived at Holy Cross Hospital at noon on January 9, 2003, to investigate the allegations of child abuse. Inwood first spoke with Officer Blackstone, then interviewed Chase for about thirty minutes as he sat on one of the emergency room beds.

Chase initially told Inwood that he injured his eye when he fell on the ice at a skating rink. When Inwood asked Chase to tell her about appellant, Chase responded that she hit him a lot. He added that appellant uses a "pow stick," which he described as a long stick, and that she hit him "all over." He also said that, just the day before, she hit him in the eye with

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the pow stick. Chase said that he was scared of appellant and that she also hit him with a cane and a belt.

Chase also said that appellant had stitched the area above his eye. He said that appellant did not apply ice to the wound; instead, she used some type of cream.

Inwood observed marks all over Chase's body, which Chase indicated were caused by appellant, who Chase believed was his mother.[3]

Chase also told Ms. Inwood that appellant would tie him to his bed and that, while tied up, he had once gone three days without food. He had been given water because he had apologized. He stated that he would be untied to use the bathroom.

Also on January 9, Ms. Inwood spoke with appellant, who denied tying Chase to the bed for days at a time. She admitted that she used the "pow stick" to discipline Chase but denied hitting him in the eye. She also admitted that she had hit Chase with a belt. She stopped using the belt when she saw that it left a mark.

Detective Karen Carvajal and Detective Frank Darley of the Montgomery County Police Department, Family Crimes Division, arrived at Holy Cross Hospital shortly before 1:00 p.m. on January 9. Upon entering the hospital, Detective Darley went to the emergency room, and Detective Carvajal and Officer Blackstone went to the lobby where Blackstone introduced Carvajal to appellant. Officer Blackstone then left the hospital.

Appellant agreed to speak with Detective Carvajal and they went to a private room off the lobby. The detective was not armed, wore plain clothes, and was six or seven months pregnant. Detective Carvajal testified that she did not tell

---

**3.** Appellant informed the police that Chase's mother, her daughter, became pregnant with Chase as the result of a rape. Appellant's daughter had wanted to abort the child, but appellant persuaded her to have the baby. Appellant was raising Chase as her child, and Chase believed that his birth mother was his sister.

appellant that she had to speak with her; rather, she simply asked to talk with appellant. Only Detective Carvajal and appellant were in the room.

According to Detective Carvajal, at no time did appellant indicate that she did not want to speak with her or that she wanted to speak with an attorney. Detective Carvajal did not advise appellant of her *Miranda* rights because appellant had accompanied Chase to the hospital, and the detective "just wanted to find out the circumstances of his injuries and what happened." During the interview, Detective Carvajal never touched appellant, did not threaten her, and did not offer appellant any inducements or rewards in return for appellant's agreeing to give her version of events. Detective Carvajal described appellant as being "jittery" but said that the tone of the conversation was "normal, not upset or accusatory. . . . I just asked her what happened." Appellant was "cooperative."

During the fifty-minute interview by Detective Carvajal, appellant did not ask to leave or use the bathroom, nor did she indicate that she was not feeling well. Nothing in appellant's appearance or demeanor suggested to the detective that appellant was ill or under the influence of drugs or alcohol.

During the interview, appellant told the detective how Chase was injured. The detective reduced appellant's statement to writing. Appellant read the statement, made additions and corrections, placed her initials beside her notations, and signed the statement.[4]

While Detective Carvajal was meeting with appellant, Detective Darley went to the emergency room and spoke with Ms. Inwood, who gave him a summary of what she had learned from Chase.

Detective Darley then interviewed Chase. During that interview, Ms. Inwood was present, as were various doctors and nurses who were in and out as they attended to Chase's

---

4. Detective Carvajal did not testify to the content of appellant's statement, and the written statement was not admitted into evidence at the pre-trial hearing. It was, however, admitted into evidence at trial.

medical needs. The detective spent less than an hour with Chase.

Detectives Carvajal and Darley next met in the emergency room. Then Detective Carvajal took Detective Darley to meet appellant. Detective Darley asked appellant if they could follow her to her residence to retrieve the stick she had mentioned, and appellant agreed. Detective Darley did not tell appellant that she could not go anywhere until the detectives had finished speaking with her, and appellant did not ask if she should speak to a lawyer.

Appellant then drove her own vehicle to her residence, and the detectives followed in a separate car. At appellant's residence, the three were on the doorstep, and appellant said that she would go inside to get the stick. Darley inquired if he and Carvajal could accompany her. Appellant responded in the affirmative. Appellant then gave the detectives the stick, which Detective Darley described as a "quarter-round piece of wood that's flimsy, approximately two feet, give or take in length." The officers were at appellant's residence for ten to fifteen minutes.

As he was about to leave the house, Detective Darley asked appellant if she would come to the police station to continue the interview. Appellant agreed and drove herself to the station. At the police station, Detective Darley informed appellant that she was *not* under arrest.

Detective Darley spoke with appellant in an interview room, and the interview was videotaped. He was in plain clothes and unarmed. At the start of the interview, Darley informed appellant that she was free to leave at any time. The interview lasted ninety minutes.

Appellant was not advised of her *Miranda* rights during this videotaped interview because Detective Darley considered it "a non-custodial interview" in which appellant "was not under arrest and was free to go and indeed, ... did leave [at approximately 4:30 p.m.] the building after the interview." According to Darley, appellant never expressed a desire to leave, never asked to speak to an attorney, and never indicat-

ed that she no longer wished to speak to the detectives. Nothing in her demeanor or appearance indicated to Darley that she was ill or under the influence of any medication or drugs.

Detective Darley told appellant that he was going to try to bring the matter to a successful conclusion and that one of his purposes was to make sure that the behavior that Chase talked about did not happen again. He also informed appellant that he would talk to Child Protective Services concerning the information appellant gave to the police, but that Protective Services would decide what would happen to Chase. The detective added that he never told appellant that he could do anything for her or that he would help her.

During the interview, appellant again mentioned the "pow stick." She also stated that she used Chase's belt on him and agreed to give the detectives the belt. After the interview, Detective Darley followed appellant back to her residence where she gave him the belt.

Amandip Kaur, a registered nurse employed at Holy Cross Hospital, admitted Chase to the pediatrics ward from the emergency room on January 9, 2003. She spent approximately one-half hour with Chase. Kaur recalled that Chase's right eye was "really swollen and red" and that he had two sutures above the eye. After admitting Chase, Kaur did a "head-to-toe assessment of him" and noted that "he had various scars and bruises throughout his body." The scars "were like U- and C-shaped marks."

When Kaur asked Chase what happened to his eye, he replied that he had fallen. Kaur continued with her examination and, upon seeing the other bruises and scars, asked Chase if he was sure he had fallen. Chase responded: "[W]ell actually my mom hit me with a stick." When Kaur asked why she hit him, Chase answered that it was because he had been "a bad boy" and had not done his "math and spelling lessons." Kaur also asked Chase about the various scars on his body, and he again stated that appellant had hit him with a stick.

Kaur had no difficulty understanding Chase, and the child was responsive to her questions. She never suggested to Chase what had happened, or that anyone had done anything to him. Chase used language appropriate for his age and never told Kaur anything to make her believe that anyone had put him up to making those statements.

The next day, January 10, Ms. Inwood took Chase to a foster home and told the child that he would not be going home. Chase replied that he did not want to go home because "his mother pows him too much."

On January 22, 2003, Dr. Nerita Estampador–Ulep,[5] a pediatrician employed by the Department of Health and Human Services, interviewed and examined Chase, who was brought to the doctor's office by Inwood. Dr. Estampador–Ulep spent approximately thirty minutes with Chase. Outside of Chase's presence, Inwood provided the doctor with Chase's medical records and a photograph of the injury to his eye. When Dr. Estampador–Ulep asked Chase what happened, he stated that his mother hit him with a stick because he was bad and did not do his math.

Dr. Estampador–Ulep testified that Chase was well-developed, very friendly, very open, verbal, cooperative, and conducted himself as would a child older than his age. Upon removing Chase's clothing, the doctor observed "all these bruises, old scars really, of injury to his skin." He had "linear scars" on his body and "loop marks" on his back and thighs. Chase indicated that he had gotten the loop marks on his thighs when appellant hit him with an "electric."[6] Chase also said that appellant had hit him with a stick on his eye and that no one else had hit him.

Dr. Estampador–Ulep did not ask Chase leading questions and did not suggest to him what had happened to him.

---

5. In the record, Dr. Estampador–Ulep's name is also spelled as Estambador–Ulep. We adopt the spelling of Estampador–Ulep.

6. Later, Inwood explained to Dr. Estampador–Ulep that meant an electric cord.

Inwood was present for the interview, but Chase did not look to Inwood while he was with the doctor. Dr. Estampador–Ulep opined that, due to the location of the loop marks and the pattern of the marks, the marks were intentionally inflicted and were consistent with having been caused by use of an electrical cord.

At the hearing to suppress the foregoing statements, appellant did not testify.

### B.

At the pretrial hearing, the defense argued that, under the totality of the circumstances, the statements made by appellant should be suppressed, for the following reasons: (1) appellant "was not free to go" and "was in custody," when the police decided to send the child to the hospital and told her to go there; (2) a reasonable person in appellant's situation would not have felt free to leave, when she was "separated from a child" who had been in her care and custody since his birth; (3) a police officer took appellant's identification and could not remember when it was returned; (4) at the hospital, at least one police officer stayed with her, continuously; (5) no *Miranda* warnings were ever given, before any questioning; and (6) appellant's interrogators at the police station offered her the improper inducement that they would tell Child Protective Services that she helped the police, if she made a statement. The motions judge denied the suppression motion.

Defense counsel also contended that the State's witnesses should not be allowed to testify as to what Chase had told them—unless Chase was called as a witness. Defense counsel made the following argument:

> [T]here was no evidence "that the child could tell the difference between the truth and a lie"; that during the court's meeting with the child, then five years old, he falsely claimed to be six years old, and he was never asked about either "the difference between the truth and a lie," or "the importance of telling the truth"; that the State's witnesses to the child's statements did not ask him about these

important concepts; that there was no video recording or transcript of these statements; that "[w]e have no idea what the questions were" and whether they were "suggestive"; that the witnesses admittedly would be "paraphrasing" both the questions and answers, as opposed to providing the "exact" ones involved; that the child was only four years old, at the time he made these statements; that suggestive questions or comments in one interview could have "tainted" the next interview; that the child initially explained his injury by saying that he "fell," which the witnesses did not "believe," but as the medical witness admitted, "if a child was asked a question more than once, they may believe that their first answer was wrong"; and that the child did not provide information about the nature and duration of the alleged abuse.

The motions judge granted the State's motion to admit the out-of-court statements made by Chase.

## II. *DISCUSSION*

### A.

■ Appellant claims that the court erred in denying her motion to suppress the statements she made to the police. She contends that, when the police responded to the scene to check on Chase's welfare, they focused immediately on her because she was the child's care giver. Appellant asserts that the questioning took on the characteristics of a custodial interrogation when the police took Chase away from her, took her identification, and told her to follow them to the hospital. Appellant claims that, during her detention, the police were waiting for her resistance to be worn down, for her to change her story, and thus for her to confess. Appellant stresses that she was never advised of her *Miranda* rights; yet, the police used language that constituted a show of authority to get her to remain at the scene, to answer questions, and to go to the hospital for more questioning.

Appellant also asserts that her statement at the police station was involuntary because Detective Darley promised to

tell Child Protective Services of her cooperation. She alleges that such a promise, made to a woman who acted as Chase's mother, must have carried great weight. Further, the show of authority by the police was sufficient to convince her to agree to take them to her home and hand over the pow stick and belt used to strike Chase.

■ In reviewing the grant or denial of a motion to suppress evidence under the Fourth Amendment, we ordinarily consider only the information contained in the record of the suppression hearing and not the trial record. *State v. Green*, 375 Md. 595, 607, 826 A.2d 486 (2003). We also view the facts in a light most favorable to the State as the prevailing party on the motion. *State v. Collins*, 367 Md. 700, 707, 790 A.2d 660 (2002). "Although we extend great deference to the hearing judge's findings of fact, we review, independently, the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed." *Laney v. State*, 379 Md. 522, 533–34, 842 A.2d 773, *cert. denied*, 543 U.S. 966, 125 S.Ct. 434, 160 L.Ed.2d 335 (2004) (citations omitted).

"[A] defendant's confession is admissible only if it is '(1) voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda*.' "

*Hof v. State*, 337 Md. 581, 597–98, 655 A.2d 370 (1995) (quoting *Hoey v. State*, 311 Md. 473, 480, 536 A.2d 622 (1988) (citations omitted)).

■ Under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), "an accused's statement cannot be used against the accused at trial if it was the product of 'custodial interrogation' and the police did not inform the accused of certain habitual warnings before taking a statement." *Minehan v. State*, 147 Md.App. 432, 440, 809 A.2d 66 (2002). Those warnings include that the accused "has the right to remain silent, that any statement he does make may

be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

■ Whether appellant was in "custody" when she made the incriminating statements is a legal question, which we decide *de novo* using the facts found by the suppression court. *Ashe v. State*, 125 Md.App. 537, 549, 726 A.2d 786 (1999). The facts as found by the court in the case at hand were:

> Now, with respect to the motions to suppress statements made by [appellant], there were a number of issues raised yesterday.... [7]
>
> But let's talk about, starting with, were these custodial interrogations? ... Starting with the ... encounter on the street when the officers first arrived at the scene. There was an argument made that Ms. Griner was not free to leave. The Court does not, and therefore, there was a custodial detention of some kind, and I do not find that. In fact, I think what occurred was Chase was not free to leave because the officers had determined they were going to have someone look at his eye. And I believe Ms. Griner was acting as you would expect her to act as his custodian by staying with him because she was his grandmother. She was taking care of him. She wasn't going to leave him there. So, in that sense, she did not leave because Chase was there but that's not the same thing, by any means, as any kind of custodial detention.
>
> And there was a little bit of difference between the various officers' testimony as to whether or not someone was, in fact, with Ms. Griner nonstop throughout the day while she was at the hospital waiting room and so forth. But I do not find, whether or not they're entirely consistent on this point, I do not find she was in any way in custody at that point. She was, in fact, free to leave. She was sitting in a hospital waiting room. There were various officers going in and talking to her at different times. But she was

---

7. The court had heard argument on the motion the previous day.

very clearly not in custody. And was not in custody, as far as I'm concerned, that entire day. She drove her own car back to her house. She drove her car to the hospital that day. I think she drove back to the house twice with the police officers following her to pick something up but not because she was in any way being held or in custody. So, I do not find there to be an issue with custodial interrogation.

With respect to a voluntary consent to be in the house, apparently Ms. Griner, although I'm not sure where I heard this from, did initially ask the officers to wait outside. When they asked if they could come inside she let them. I don't believe that there was anything involuntary about that.

The next issue, I believe, raised was whether or not there were any improper promises made during the course of the video interview. And I think I had told you that I'd felt I needed to read the transcript before I could rule on that because you all had seen the video but I had not. And I still haven't seen the video but I have, in fact, read through the transcript.

The officers make it clear during the course of that interview she was not under arrest. She was not in custody. She was free to leave. No matter what she said she was still going to be free to leave at the end of the interview, which, in fact, she was. She left. Court does not find that the statements she made were the result of any improper inducements or involuntary coercion.

In *Bond v. State,* 142 Md.App. 219, 228, 788 A.2d 705 (2002), we said:

"In determining whether an individual was in custody [when he was questioned], a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint of freedom of movement" of the degree associated with a formal arrest.'" *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77

L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977))). Accordingly, the issue of custody is to be decided under an objective standard, *i.e.*, "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Furthermore, the decision whether the accused was in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California, supra,* at 323, 114 S.Ct. 1526.

*See also Minehan,* 147 Md.App. at 440, 809 A.2d 66 ("Custody means a formal arrest, or another serious restriction on freedom of movement.") (citation omitted); *Reynolds v. State,* 88 Md.App. 197, 209, 594 A.2d 609 (1991) (" 'Custody' ordinarily contemplates that a suspect will be under arrest, frequently in a jailhouse or station house setting."), *aff'd,* 327 Md. 494, 610 A.2d 782 (1992).

In the case *sub judice,* appellant was never told by a police officer that she was *not* free to leave. No officer placed his or her hands on appellant or physically restrained her. At all times, appellant was free to stop the police questioning and to leave. She was not placed under arrest, and she never indicated in any way that she did not want to speak to the officers or that she wished to speak with an attorney, nor was appellant told or ordered to go to the hospital with them.

In addition, when traveling to the hospital, her house, the police station, then back to her house, appellant traveled alone in her own vehicle. The police officers and detectives never told appellant that she had to go to any of these places or that she was required to give a statement or turn over the "pow stick" or belt.

At the police station, Detective Darley informed appellant that she was *not* under arrest and that she was free to leave at any time. Following the interview, she left the police station.

The motions judge did not err in concluding that appellant was never in custody and, therefore, that the dictates of *Miranda* did not apply. *See Minehan,* 147 Md.App. at 440–43, 809 A.2d 66 (defendant not in custody where he accompanied officers to the police station, was not restrained in any way, stated that he had come with the officers of his "own free will," was told by the officers that he did not have to answer any questions and was free to leave, and left station after interview); *Ashe,* 125 Md.App. at 551–52, 726 A.2d 786 (where defendant accompanied officers to police station, was told he was not under arrest and was free to go at any time, even though questioning took place in police station and defendant was surrounded by police officers, defendant was not in custody).

We next consider appellant's claim that her statement given at the police station was involuntary. *See In re Eric F.,* 116 Md.App. 509, 516, 698 A.2d 1121 (1997) ("Even if appellant was not in custody, the confession obtained during a noncustodial interrogation is presumptively inadmissible, unless it is shown to be free of coercion."). "Voluntariness under Maryland nonconstitutional law (i.e., common law) means that the incriminating remark must be 'shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary.' " *Jackson v. State,* 141 Md.App. 175, 186, 784 A.2d 670 (2001) (quoting *Hillard v. State,* 286 Md. 145, 150, 406 A.2d 415 (1979)). Accordingly, "a confession is involuntary if it is induced by force, undue influence, improper promises, or threats." *Hoey,* 311 Md. at 483, 536 A.2d 622 (citation omitted).

Voluntariness is determined by the totality of the circumstances. *Reynolds v. State,* 327 Md. 494, 504, 610 A.2d 782 (1992). "The 'totality of the circumstances' test also governs the analysis of voluntariness under the State and Federal Constitutional provisions." *Burch v. State,* 346 Md. 253, 266, 696 A.2d 443 (1997) (citations omitted). *See also Colorado v. Connelly,* 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (In determining the voluntariness of a

confession under the Due Process Clause of the Fourteenth Amendment, the inquiry focuses on the "crucial element of police overreaching."). Under the totality of the circumstances, we may consider such things as the age and education of the suspect, the length of the interview, and how many officers were present during the interview. *Hof,* 337 Md. at 596–97, 655 A.2d 370; *Hoey,* 311 Md. at 481, 536 A.2d 622. "[I]f an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible." *Hillard v. State,* 286 Md. 145, 153, 406 A.2d 415 (1979).

Here, Detective Darley informed appellant that he would speak to Child Protective Services concerning the information appellant had given him. The detective did not say that he could or would do anything for appellant, that he could help her, or that he would assist her in any fashion. There was no improper inducement in the detective's statement. *See, e.g., Ball v. State,* 347 Md. 156, 174–78, 699 A.2d 1170 (1997) (interrogating officer's statement that it would be much better if the suspect told the story was not sufficient to render the inculpatory statement involuntary); *Boyer v. State,* 102 Md. App. 648, 651–54, 651 A.2d 403 (1995) (where police officer told the suspect he would inform prosecutor that he had given a statement and was cooperative, but the officer did not state that the suspect would receive a lesser sentence, or that things would be easier on him, or the officer would help if he gave a statement, there was no improper inducement). *Cf. Winder v. State,* 362 Md. 275, 313–18, 765 A.2d 97 (2001) (during a twelve-hour interrogation, officers' statements that they would assist the suspect in obtaining psychological assistance and leniency from the prosecuting authorities and protect him from vigilantes seeking revenge for the murders were improper inducements); *Hillard,* 286 Md. at 153, 406 A.2d 415 (improper inducement where police told accused they would "go to bat for" him); *Streams v. State,* 238 Md. 278, 281–83,

208 A.2d 614 (1965) (improper inducement where police told suspect they would try to get him probation if he talked, but would "throw the book" at him if he refused to cooperate).

## B.

Appellant next claims that the trial court erred in determining that, under Section 11–304 of the Criminal Procedure Article of the Maryland Code (2001), Chase's out-of-court statements were admissible at trial. She alleges that the exception in Section 11–304 did not apply for several reasons: (1) no one determined whether Chase could tell the difference between the truth and a lie or that he understood the importance of telling the truth; (2) the questions asked of Chase and his responses were not recorded; (3) the repeated questioning of Chase by "skeptical adults" may have led Chase to believe that his original answers to their questions were "wrong." As a result, appellant contends, the aforementioned statutory hearsay exception did not apply.

The State responds that, although the court conducted a pre-trial hearing and determined that Chase's statements were admissible under Section 11–304, the statements were not admitted at trial under that section. The State is correct.

At trial, immediately prior to the questioning of Amandip Kaur (the nurse who admitted Chase to the pediatrics ward on January 9, 2003), the jury was excused and the State proffered that Chase's statements to Kaur were admissible as exceptions to the rule against hearsay because they were made for purposes of medical diagnosis or treatment. Defense counsel responded that the exception requires that Chase be aware that the success and quality of treatment largely depended on the accuracy of the information he provided to the nurse. Counsel alleged that there was no such showing and referred the court to *Low v. State*, 119 Md.App. 413, 705 A.2d 67 (1998), and *Cassidy v. State*, 74 Md.App. 1, 536 A.2d 666 (1988). Defense counsel further argued that because so many individuals had spoken to Chase before Kaur admitted him to the

pediatrics ward, Chase's statements were not reliable. Additionally, counsel maintained that under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *Snowden v. State,* 156 Md.App. 139, 846 A.2d 36 (2004), *aff'd,* 385 Md. 64, 867 A.2d 314 (2005) (*Snowden II*), Chase's statements were testimonial and that the defense had no opportunity to cross-examine the child. As a result, admission of Chase's statements to Kaur would violate appellant's Sixth Amendment right to be confronted with the witnesses against him.

The trial court found that *Crawford* was inapplicable because Chase's statements were not testimonial. The court said:

> [S]tatements Chase made to the nurse do qualify as statements made for purposes of obtaining medical treatment and [are] therefore admissible under, as an exception to the hearsay rule, and in doing that, considering the fact that this is not a situation where the examination is weeks after this event occurred, although I don't know for sure whether it occurred that day or the day before, but he had just been taken to the hospital. This is his first trip for medical treatment in connection with that eye injury. He's clearly talking to a nurse. Now I'm assuming that the nurse was in uniform of some kind, but truthfully, I don't know that. Although she testified, I don't remember if she said anything about a uniform, but I'm going to assume if it was a nurse in the hospital, she had some kind of a nurse's uniform or scrub on, and he's clearly in a place for medical treatment and at four years old, there's certainly, they're familiar with going to the doctor. So I'm going to say that he was there, he knew he was there to get medical treatment.

Thereafter, Kaur testified that although Chase initially stated that he had injured his eye when he fell, upon questioning Chase a second time, Chase said that appellant had hit him. Kaur further testified that Chase told her that he had gotten

the scars and bruises because appellant hit him.[8]

In regard to the out-of-court statements Chase made to Dr. Estampador–Ulep, the court found that they would not be admissible under the "treating physician" exception to the rule against hearsay because the doctor did not see Chase for purposes of treatment. The court, however, ruled that it would permit the doctor to offer limited testimony on the statements Chase made insofar as those statements related to her expert opinion. The court explained:

> Well, I think to the extent the doctor's relying on specific statements about how the injury occurred as part of the history for purposes of her expert's opinion, that she can testify to those but that is strictly limited to how the injury was inflicted because that's the only part that would be the basis for her opinion.

Later, outside the presence of the jury, Dr. Estampador–Ulep was questioned by defense counsel concerning the basis of her opinion. The doctor stated, in part, that her opinion would be the same even if Chase had not told her that he had been hit with a stick, a belt, and an electric cord. The court

---

**8.** The State asserts that this question is not properly before us because appellant raised no objection to the questions that elicited Kaur's testimony concerning Chase's statements. We disagree. Counsel objected when Kaur was responding to the State's inquiry as to whether she asked Chase any additional questions after Chase stated that he had fallen. The court overruled the objection, but Kaur did not complete her answer and, upon resuming questioning, the State did not immediately pursue that inquiry. Later, counsel again objected during Kaur's testimony after she stated that Chase had informed her that his mother had hit him. We consider these objections sufficient to preserve this question for our review. Further, just prior to Kaur's testimony, the trial court ruled that Chase's statements were admissible. We thus question the need for further objection by defense counsel. *See generally Watson v. State*, 311 Md. 370, 372 n. 1, 535 A.2d 455 (1988) (where motion *in limine* was ruled upon prior to trial and court reiterated ruling immediately prior to State's cross-examination of defendant, during which evidence defense had sought to exclude was elicited, "requiring [defendant] to make yet another objection only a short time after the court's ruling to admit the evidence would be to exalt form over substance").

found that the doctor's testimony concerning Chase's out-of-court statements was inadmissible. The court commented:

[B]ased on the fact she's testified that her opinion frankly wouldn't change if Chase hadn't said anything about this and given the difficulties that have been presented by the Crawford case and the statute no longer being the basis for this, I mean I just think it's setting us up for unnecessary problems in this situation. And I'm going to rule that the doctor is not allowed to give the specifics of what Chase told her unless she's asked on cross-examination what the history was that she's relying on—

As a result, Dr. Estampador–Ulep did not testify to any statements Chase made to her, nor did Detective Darley or Inwood offer any evidence concerning the substance of Chase's out-of-court statements against appellant.

Dr. Stanley Sinkford, a pediatrician who examined Chase in the emergency room at Holy Cross Hospital, testified that Chase told him that he had injured his eye when he fell. When the doctor asked Chase how he fell, Chase stated that he did not know. Chase also told him that he did not know how he had gotten the scars on his body. Dr. Sinkford testified that he then stopped questioning Chase because the boy was becoming upset.

As can be seen, although the motions judge granted the State's motion to permit Dr. Estampador–Ulep, Inwood, and Kaur to testify to Chase's out-of-court statements under Section 11–403 of the Criminal Procedure Article, ultimately, the court permitted only Kaur to offer testimony concerning the statements made by Chase that implicated appellant. Chase's statements to Kaur were admitted under Maryland Rule 5–803(b)(4) as statements made for purposes of medical diagnosis or treatment.

On appeal, appellant raises no claim that Chase's statements were improperly admitted under the 5–803(b)(4) exception to the rule against hearsay. She limits her argument to the trial court's grant of the State's motion to admit Chase's statements under Section 11–304. It is therefore impossible to see

how appellant was prejudiced even if we were to assume, *arguendo*, that the statements were inadmissible under Section 11–304.

Technically, the question of whether the court erred in admitting Chase's statements under Rule 5–803(b)(4) is not properly before us. *See* Md. Rule 8–504(a)(5) (a brief shall include "[a]rgument in support of the party's position"); *Klauenberg v. State*, 355 Md. 528, 552, 735 A.2d 1061 (1999) ("arguments not presented in a brief or not presented with particularity will not be considered on appeal"); *Federal Land Bank of Baltimore, Inc. v. Esham*, 43 Md.App. 446, 457, 406 A.2d 928 (1979) ("[I]t is necessary for the appellant to present and argue all points of appeal in his initial brief. . . . [O]ur function is not to scour the record for error once a party notes an appeal and files a brief.").

Nonetheless, even if appellant had contended that the statements were inadmissible under Rule 5–803(b)(4), appellant would not prevail.

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him." U.S. Const. amend. VI.[9] In *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause permits admission of testimonial evidence only if (1) the hearsay declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant.[10] The Court left

---

9. The protections of the Confrontation Clause are applicable to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Article 21 of the Maryland Declaration of Rights (MDR) is Maryland's counterpart to the Confrontation Clause and provides that "in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him." The Court of Appeals has construed the Confrontation Clause and Article 21 of the MDR to be in *pari materia*. *Simmons v. State*, 333 Md. 547, 555 n. 1, 636 A.2d 463 (1994) (citing *Craig v. State*, 322 Md. 418, 430, 588 A.2d 328 (1991)).

10. Under *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the indicia of reliability was a consideration. In *Crawford*,

"for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id.* (footnote omitted). Nonetheless, the Court noted that, at a minimum, the term applied "to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

In *Snowden II*, 385 Md. 64, 80, 867 A.2d 314 (2005), the Court of Appeals discussed *Crawford* and noted that the Supreme Court "offered three proposed formulations to demonstrate the 'core class' of what is 'testimonial' " for purposes of the Confrontation Clause:

> "[1] ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," [2] "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,"; [3] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Snowden II*, 385 Md. at 81, 867 A.2d 314 (quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354 (citations omitted)).

---

however, the Supreme Court held that if the out-of-court statements were testimonial, the Confrontation Clause was implicated and admissibility of the statements did not turn on either indicia of reliability or state hearsay law. Thus, once the Confrontation Clause is triggered, based on the testimonial nature of the out-of-court statements, the indicia of reliability criteria plays no part in the analysis. *See Crawford*, 541 U.S. at 61, 124 S.Ct. 1354 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability. ....' " Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.).

In *Crawford*, the defendant's wife did not testify at trial because of the state marital privilege and the defendant had no opportunity for cross-examination. Nonetheless, the recorded statement made by the defendant's wife during a police interrogation was admitted into evidence. The Supreme Court concluded that use of the recorded statement violated the defendant's Sixth Amendment right to confront the witnesses against him. 541 U.S. at 68–69, 124 S.Ct. 1354.

The Court of Appeals relied on *Crawford* in *Snowden II* in which it held that the statements three child-victims gave to a sexual abuse investigator for the Montgomery County Department of Health and Human Services were improperly admitted at trial under Md.Code (2001), § 11–304 of the Criminal Procedure Article. *Snowden II*, 385 Md. at 84–92, 867 A.2d 314. The Court concluded that, in the context of police interrogations, "the proper standard to apply to determine whether a statement is testimonial is whether the statements were made under circumstances that would lead an objective declarant reasonably to believe that the statement would be available for use at a later trial." *Id.* at 83, 867 A.2d 314 (footnote and citation omitted).

At the beginning of each interview conducted by the sexual abuse investigator, each child indicated that she was aware that she was being interviewed as a result of her accusations against Snowden. *S wden II*, at 385 Md. at 70, 867 A.2d 314. The Court noted that the investigator's "role as interviewer was little different from the role of a police officer in a routine police investigation." *Id.* at 86, 867 A.2d 314. In addition, a detective attended each interview. *Id.* at 69, 867 A.2d 314. The children's statements were thus testimonial and improperly admitted because the children did not testify at trial and Snowden had no opportunity for cross-examination. *Id.* at 85–86, 867 A.2d 314.

Turning to appellant's case, we conclude that the trial court correctly found that Chase's statements to Kaur were not testimonial. Kaur examined and questioned Chase as a routine preliminary procedure necessary prior to admitting him to the

pediatrics ward. Kaur's questioning of Chase was not the equivalent of a police interrogation. Kaur was a nurse on the pediatrics ward performing her regular duties. The purpose of Kaur's examination was to assess Chase's condition, obtain his vital signs, and administer any necessary medications. Upon meeting Chase, Kaur informed him that she was a nurse and that she was going to take care of him. The purpose of her questioning was "to gather information so we could pass that on to the doctors and collaborate on the plan of care" and establish a good treatment plan. Chase was unafraid, smiling, wanted to play, and told Nurse Kaur that he was not in any pain. Under the standards enunciated in *Crawford*, Chase's statements to Kaur were not testimonial. *See Wallace v. State*, 836 N.E.2d 985, 996 (Ind.Ct.App.2005) (statements by murder victim identifying his killer in response to questions posed by an unknown civilian, EMT, and a nurse held non-testimonial because they were not taken " 'in significant part . . . with an eye towards trial' ") (citation omitted); *State v. Scacchetti*, 690 N.W.2d 393, 397 (Minn.Ct.App.2005) ("[Child's] out-of-court statements to a nurse practitioner, made in a hospital while the nurse examined [child] for purposes of medical diagnosis, were not testimonial and therefore their admission did not violate Scacchetti's right to confrontation even though [child] did not testify at trial and Scacchetti did not have a prior opportunity to cross examine her."); *Foley v. State*, 914 So.2d 677, 683–85 (Miss.2005) (statements by sexual assault victim to examining physician indicating that defendant forced her to perform oral sex and other sexual acts were non-testimonial); *State v. Vaught*, 268 Neb. 316, 682 N.W.2d 284, 287–90 (2004) (child victim's statement to emergency room doctor identifying defendant as perpetrator of abuse was non-testimonial and, instead, was made for purposes of medical diagnosis and treatment inasmuch as "[t]here was no indication of a purpose to develop testimony for trial, nor was there an indiction of government involvement in the initiation or course of the examination"); *State v. Fisher*, 130 Wash.App. 1, 108 P.3d 1262, 1269 (2005) (statement child made to pediatrician the morning after he was admitted to the hospital was

not testimonial because doctor was not a government employee, the defendant was not then under suspicion, doctor questioned child in an effort to provide him with the proper treatment, there was no government involvement, and the statement was not given under circumstances in which its use in a prosecution was reasonably foreseeable by an objective observer). *Cf. In re T T.*, 351 Ill.App.3d 976, 287 Ill.Dec. 145, 815 N.E.2d 789, 804 (2004) (child's statements responding to doctor's questions regarding the nature of the alleged attack, the physical exam, and complaints of pain or injury, were governed by the medical treatment hearsay exception statute; however, child's accusatory statements identifying defendant as the perpetrator implicated the core concerns protected by the confrontation clause. "When the content of [child's] statement concerned fault or identity, then such testimonial statements are only admissible through [examining doctor] if [child] testifies at trial and is subject to cross-examination.").

The next question to be resolved is whether the trial court properly admitted Chase's "non-testimonial" statements to Kaur. *See Crawford*, 541 U.S. at 68, 124 S.Ct. 1354 (when the admissibility of non-testimonial hearsay is at issue, the individual states are free to determine what statements should be admitted and what statements should be excluded based on their hearsay law.).

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801. As a general rule, hearsay is not admissible at trial. Md. Rule 5–802. "A hearsay statement may be admissible, however, under an exception to the hearsay rule because circumstances provide the 'requisite indicia of trustworthiness concerning the truthfulness of the statement.'" *State v. Harrell*, 348 Md. 69, 76, 702 A.2d 723 (1997) (quoting *Ali v. State*, 314 Md. 295, 304–05, 550 A.2d 925 (1988)).

Under Maryland Rule 5–803(b)(4), the following is not excluded by the rule against hearsay, even though the declarant is available as a witness:

**Statements for Purposes of Medical Diagnosis or Treatment.** Statements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

"The rationale behind this exception is that the patient's statements are apt to be sincere and reliable because the patient knows that the quality and success of the treatment depends upon the accuracy of the information presented to the physician." *In re Rachel T.*, 77 Md.App. 20, 33, 549 A.2d 27 (1988) (citation omitted). "The exception specifically contemplates the admission of statements describing how the patient incurred the injury for which he is seeking medical care." *Webster v. State*, 151 Md.App. 527, 536, 827 A.2d 910 (2003). "[I]f the doctor needed to know the source of the injury in order to determine treatment ..., the patient's statement as to source should be admissible, particularly if the doctor told the patient that the information was necessary for proper treatment." 6A Lynn McClain, *Maryland Evidence* § 803(4):1, at 218 (2d ed.2001). "Only statements that are both **taken and given** in contemplation of medical treatment or medical diagnosis for treatment purposes fit within the Rule 5–803(b)(4) hearsay exception." *Webster*, 151 Md.App. at 537, 827 A.2d 910 (citations omitted; emphasis in original). There is no requirement that the witness be a treating physician holding a medical degree in order for the exception to apply. *See Choi v. State*, 134 Md.App. 311, 321–22, 759 A.2d 1156 (2000) (trial court properly admitted, under Maryland Rule 5–803(b)(4), report of paramedic responding to treat assault victim that victim reported that she had been kicked and stomped); *In re Rachel T.*, 77 Md.App. at 20, 549 A.2d 27 (where treating physician was unsuccessful in eliciting information from child victim of sexual abuse and physician requested a specially trained social worker to interview the child as part of an interdisciplinary team method, statements the

child made to the social worker indicating that her father had severely sexually abused her were related to medical treatment and were an important part of the medical history to be relied upon by the treating physician, and child knew they would be used to provide appropriate treatment, therefore, statements properly admitted at trial).

In the subject case, we conclude that there was enough evidence that Chase, who was four-years and eight-months old, understood that there were medical reasons for telling Nurse Kaur what happened. *Cf. Cassidy v. State,* 74 Md.App. 1, 29–30, 536 A.2d 666 (1988) (two-year-old patient did not understand nature or purpose of her interview with the doctor; she was not mature enough "to possess the concerned physical self-interest which is at the very core of" the statement to a treating physician exception); *In re Rachel T.,* 77 Md.App. at 35, 549 A.2d 27 (in contrasting facts of case with those in *Cassidy,* Court noted that Rachel was a few weeks shy of five years of age when she made the statement at issue and that "[t]here is a vast difference between the cognitive development of a two-year old and a child of five"). He was brought to the hospital as a result of police intervention and had been in the emergency room where he was examined by Dr. Sinkford and interviewed by Inwood and Detective Daley. Although Chase was questioned by Nurse Kaur on the day after he suffered his injury to his eye, Chase's eye was still nearly swollen shut when he talked with Nurse Kaur. *Cf. Cassidy,* 74 Md.App. At 33–34 (child's statement to doctor that "Daddy did this" was not admissible, in part, because statement was not related to treatment, the bruises were at least three days old, and no treatment of physical symptoms was involved). Kaur, a registered nurse, was waiting for Chase when he was brought to his room on the pediatrics ward. Kaur introduced herself as a nurse, explained to Chase that she was going to take care of him, and that she would examine him from "head to toe." Chase was able to respond appropriately to Kaur and made eye contact with the nurse when he spoke to her. Kaur asked Chase if he could open his injured eye wide enough to see clearly, and Chase said that he could.

In addition, Kaur had no difficulty understanding Chase or communicating with him. Kaur also touched the eye lightly to determine if it was hot and she noted that "it was pretty warm to the touch." *Cf. Low v. State,* 119 Md.App. 413, 422–26, 705 A.2d 67 (1998) (where doctor was, in essence, part of the prosecution team and did not render any treatment to the child, child's statements to doctor were not admissible as a statement to a treating physician). Under these circumstances, we conclude that the trial court properly admitted Chase's statements to Kaur under Rule 5–803(b)(4).

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**