14 A.3d 692

**Joanna DAVIS**

v.

**Michael A. PETITO, Jr.**

**No. 468, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Feb. 28, 2011.

488

John R. Seward (Donald P. Salzman, on the brief), Washington, D.C., for appellant.

Laura E. Borowsky & Mark P. Brennan (Cockey, Brennan & Maloney P.C., on the brief), Salisbury, MD, for appellee.

Panel: EYLER, DEBORAH S., ZARNOCH and
LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

Joanna Davis, the appellant, and Michael Petito, the appellee, are the divorced parents of Sophia Petito, a minor child. In a custody modification proceeding, the Circuit Court for Wicomico County ruled that Davis did not prove her allegation that Petito had sexually abused Sophia. Ultimately, the court concluded that, although there was no material change in

circumstances in the form of sexual abuse by Petito, Davis's unproven allegations of sexual abuse against Petito had brought about a material change in circumstances, namely that Petito's relationship with Sophia had been interrupted for over a year and Sophia had been led to believe that Petito was someone to fear. On that basis, the court modified the prior visitation schedule with the objective of fostering reunification between Sophia and Petito. In addition, the court ordered Davis to pay $30,773.54 (approximately half) of Petito's attorneys' fees.

On appeal, Davis poses three questions for review, which we have rephrased:

I. Did the circuit court err in precluding her rebuttal expert witness from testifying?

II. Did the circuit court err in ruling that certain statements made by Sophia to a therapist were inadmissible hearsay not covered by the hearsay exception for statements made for purposes of medical diagnosis and treatment?

III. Did the circuit court err in awarding attorneys' fees to Petito?

For the reasons to follow, we shall affirm the circuit court's judgment.

## FACTS AND PROCEEDINGS

Joanna Davis and Michael Petito were married in December of 1998 and were granted an absolute divorce on April 11, 2006. Sophia, born on October 22, 2003, is their only child. Prior to the absolute divorce, the court granted a limited divorce and gave Davis primary physical custody of Sophia with Petito having overnight visitation with Sophia every other weekend and every other Wednesday. The parties shared legal custody. Custody and visitation remained the same after the absolute divorce was granted.

Davis lives with her mother. During the relevant time periods, Petito lived some of the time with his parents and

some of the time with his girlfriend, Christina Torres, and Torres's daughter Jules. Sophia spent some of her overnight visits with Petito at her paternal grandparents' house and some at Torres's house.

In the fall of 2008, Sophia, then almost 5, started acting out when it was time to leave with her father for their scheduled visits. She screamed and cried and refused to go with him. According to Davis, Sophia began having nightmares around this time as well. Sophia also held her bowels while at her father's house. Both parents agreed that she should start seeing a therapist.

On October 20, 2008, Sophia started therapy with Donna Leffew, a licensed clinical professional counselor ("LCPC"). Leffew conducted separate intake interviews with each parent at the start of the sessions. Prior to meeting with Sophia for the first time, Leffew met with Davis. She met with Petito shortly after the sessions had started. Both parents reported similar issues with Sophia, including difficulty sleeping, nausea, and anxiety. Davis informed Leffew during her intake interview that Sophia had reported a nightmare in which "a monster came in the room and it poked her in her heiney."

During her sessions with Leffew, Sophia was asked about her nightmares and drew pictures of a monster with a protrusion ("his thing") around his waist level that she said stuff came out of and could get into her. She became extremely anxious when discussing the monster, raising her voice and scribbling hard on her paper.

As the sessions progressed, Sophia told Leffew that she saw the monster only when she was with Petito. At one point, she told Leffew that the monster "looks like daddy" and smelled like him. She also acted out her nightmares with dolls, always using a lizard doll to represent the monster and placing it on top of a girl doll, face to face, lying down on the couch. Sophia never told Leffew that her father had committed any act that would constitute sexual abuse, however.

On December 3, 2008, Leffew made a report of suspected sexual abuse to the Wicomico County Department of Social

Services ("DSS"). That same day, Sophia was interviewed by Anita Murphy, a DSS investigator. Sophia made no specific disclosures of abuse to Murphy. Murphy recommended that an extended forensic evaluation be performed. Sophia underwent a physical examination on December 4, 2008, and again on January 15, 2009. Both were performed by Jennifer Wehberg, M.D., and revealed no physical evidence of abuse.

The Wicomico County Sheriff's Department conducted a separate criminal investigation of the report of suspected sexual abuse. On December 3, 2008, Detective John Seichepine, who is assigned to the Wicomico County Child Advocacy Center ("CAC"), was given Sophia's case. He observed from a remote location Murphy's initial interview with Sophia. The next day, Detective Seichepine interviewed Petito at the CAC. Petito denied having had sexual intercourse with his daughter, otherwise touching her inappropriately, or ever masturbating in her presence or in her bedroom. He acknowledged blacking out while drunk but denied consuming alcohol while Sophia was in his care.

With Petito's cooperation, the Sheriff's Department obtained a search warrant for his parents' home and for Torres's home. During the search of Torres's home, a light was used in Sophia's bedroom to detect possible semen. Several stains fluoresced on the nightstand next to Sophia's bed, on the floor next to the bed, on the floor near Sophia's dresser, and on the dresser itself. All of the stains were swabbed and DNA testing was performed. All were negative for semen.

On December 29 and 31, 2008, Farah Smith, an LCPC, conducted an extended forensic evaluation of Sophia. During Smith's sessions with Sophia, the child reported that a monster came into her bedroom at night and "poked her in the butt." She described the monster as making grunting noises and said that it looked like Petito. She also said the monster only came when she was staying with Petito at Torres's house. At the conclusion of the evaluation, Smith recommended a finding of indicated child sexual abuse. Smith concluded that Petito likely had masturbated in Sophia's presence.

On December 22, 2008, Davis filed an emergency complaint for immediate custody of Sophia based on the allegations of abuse.

On December 31, 2008, Petito was arrested and charged with a third-degree sex offense. His case later was placed on the stet docket upon the condition that he have no contact with Sophia, aside from court-ordered therapeutic visitation, pending the outcome of the instant case.

In February of 2009, without Petito's knowledge, Leffew resumed therapy sessions with Sophia.[1] Leffew continued to hold sessions with Sophia until July 15, 2009. During that period, Leffew met with Sophia seven times. The sessions ceased after Petito learned of the therapy and refused to allow it to continue.

In the meantime, on March 5, 2009, Petito filed a counter-complaint for modification of custody. He sought joint physical and legal custody of Sophia with an expanded access schedule. He also sought a decrease in child support, occasioned by a change in Davis's income, and an award of attorneys' fees and costs.

The case was scheduled for a hearing before a master to take place on September 3, 2009. That day, a continuance was granted after Davis's rebuttal expert was excluded. (We shall discuss the exclusion of that expert witness in greater detail, *infra.*) The hearing was rescheduled to take place before the court in November. In the interim, the parties entered into a consent order pursuant to which Sophia would begin therapy with Christy McGurgan, an LCPC with Worcester Youth and Family Counseling Services, and would begin therapeutic visitation with Petito supervised by Cathy Beers, a social worker.

Beginning on November 23, 2009, the case was tried to the court over six days in 2009 and 2010.[2] The matter was

---

1. Leffew had suspended the therapy sessions during the DSS investigation.

2. Trial took place on November 23 and 24, 2009; December 7 and 8, 2009; and February 1 and 19, 2010.

bifurcated, with the first five days of trial being devoted solely to the issue of alleged sexual abuse and the last day of trial being devoted to all remaining issues, including other grounds for modification of custody, attorneys' fees, and a contempt complaint against Davis for failing to take Sophia to court-ordered therapeutic visitation with Petito.

During the first part of the trial, Davis testified and called nine witnesses, including Leffew, Smith, Detective Seichepine, and Petito. Leffew and Smith both were qualified and accepted by the court as experts. Petito testified in his case and called four witnesses, including Kathleen Killeen, Ph.D., whom he had designated as an expert in "clinical psychology, child development, psychopathology and treatment, evaluation and training of child sexual abuse, and forensic interviews with children." Finally, counsel for Sophia called McGurgan. At the conclusion of all the evidence related to the allegations of sexual abuse, the court advised the parties that it would make its decision on the issue prior to commencement of the second phase of the trial.

On February 12, 2010, the court issued a memorandum opinion ruling that Davis had failed to prove the allegations of sexual abuse against Petito. The court noted that Davis had relied heavily upon the testimony of Leffew and Smith regarding their interviews with Sophia. The court explained Davis's theory that sexual abuse had occurred as follows:

[Davis] asks the Court to find that the "monster" is [Petito], and that [Petito] commits these sexually abusive acts on the minor child. To agree with [Davis], the Court would have to connect the dots linking the "monster's" conduct to sexually abusive conduct and linking the "monster" to [Petito].

The court determined that Davis had failed to meet her burden of proof in this respect.

The court emphasized that neither Smith nor Leffew had offered a "consistent, credible opinion[ ]" as to what, if anything, had transpired between Petito and Sophia. Leffew had been unable to opine as to any specific abusive conduct by

Petito. Although Smith had testified that Petito had "poked Sophia in the butt" and had "masturbated in [ ] Sophia's presence," the court discounted Smith's testimony, in reliance upon the opinions of Petito's expert, Killeen. Killeen had testified, generally, that Sophia's statements were "insufficient to support a finding of sexual abuse." In Killeen's opinion, Sophia's resistence to visitation with her father was consistent with a "loyalty conflict[ ]" often seen in children after divorce when the parents are in a "high conflict" relationship. E-mails between the parents had established to the court's satisfaction that Davis and Petito's relationship post-divorce was one of ongoing hostility.

Killeen also had testified that Leffew and Smith's interview methods were improper for a child of Sophia's age. Specifically, they had used "leading, suggestive, and yes/no questions." According to Killeen, these interview methods are improper because most five-year-old children will want to please and agree with their interviewers and will answer yes/no questions affirmatively, even when they know the answers to be false. This can lead to "source memory problems," *i.e.*, that in future conversations the child will build upon her own previous, false answers. The court cited an example from Sophia's interview with Smith during which Sophia had misunderstood a word that Smith had used in posing a question and then had tried to incorporate the misunderstood word into her response.

The court also credited Killeen's opinion that it was the interviewers, not Sophia, who first made the link between the monster and Petito *and* who suggested that the monster was real, not imaginary. Killeen had testified that, once these suggestions were made to Sophia, her subsequent disclosures were suspect. Killeen also had opined that the interviewers seemed to approach the sessions with a predetermined belief that sexual abuse had occurred. For that reason, they had failed to consider alternative hypotheses, such as the possibility that Sophia was upset with her father because he had spanked her.

The court found Killeen's testimony to be "convincing and credible" and concluded that Davis had "failed to meet her burden of showing that it is more likely than not that sexual abuse by [Petito] has occurred." The court was particularly persuaded by "the significance of the fact that the minor child has not ever independently connected the 'Monster' to [Petito] and [Petito] to sexual abuse." The court also found that, even in the face of "leading, suggestive, and improper questions, the minor child [ ] never affirmatively confirmed these connections."

After the court issued its memorandum opinion, the remaining issues were tried for one day. The court thereafter issued a second memorandum opinion and an order finding both parents to be fit; ordering that Davis would remain the primary physical custodian; awarding Davis sole legal custody (because the parties' relationship was too contentious to continue joint custody); setting forth a detailed, phased schedule of therapeutic and supervised visitation followed by a regular visitation schedule that slightly increased Petito's access to Sophia; finding Davis in contempt for failure to abide by the prior visitation order; and awarding Petito $30,773.54 in attorneys' fees.

After timely motions to alter or amend were filed by both parties and the court issued an amended judgment, Davis noted this appeal.

We shall include additional facts in our discussion of the issues, as necessary.

## DISCUSSION

### I.

### *Exclusion of Expert Witness*

The trial date in this case originally was scheduled for September 3, 2009. A scheduling order directed that expert witnesses were to be disclosed within 60 days of trial (by July 6, 2009), and that rebuttal experts were to be disclosed within 15 days thereafter (by July 21, 2009). On June 24, Petito

identified Killeen as an expert to rebut the anticipated testimony of Leffew and Smith and to challenge the investigative techniques used by the interviewers in the case. On July 2, Davis identified Leffew and Smith as experts who would testify in her case-in-chief. Then, on July 23, Davis identified Joanna Silberg, Ph.D., a psychologist, as a rebuttal expert who would counter Killeen's testimony. Petito did not challenge Davis's designation of Silberg as being untimely.

During a deposition five days later, Petito's lawyer informed Davis's lawyer that he was planning to challenge Silberg's designation because Petito and Petito's criminal defense attorney in the related criminal case previously had spoken to Silberg over the telephone to determine if she would testify on Petito's behalf in that case.

On August 14, 2009, Davis filed a motion *in limine* asking the court to rule before trial as to whether Silberg could testify. She stated in the motion that Silberg had no recollection of any contact with Petito or his attorney; that Silberg does not maintain records of telephone calls she receives in which people seek to retain her as an expert; and that Silberg did not believe it would pose an ethical conflict for her to testify on Davis's behalf. Davis later filed an affidavit from Silberg to that effect.

Petito filed an opposition in which he stated that "[t]he privilege which creates a conflict does not lie in the purview of Dr. Silberg to exercise, but rather the privilege lies with Mr. Petito." He attached two affidavits, one that he had signed and one signed by his criminal defense attorney. Petito's affidavit stated that, during the pendency of the related criminal case, he had had "occasion to speak with Dr. Joyanne [sic] Silberg with regard to the facts in the case, her thoughts with respect to those circumstances, and her availability as a possible expert witness" for Petito. Petito's criminal defense attorney averred that

as part of [his] representation of Mr. Petito, [he] had the occasion to speak to Dr. Joyanne [sic] Silberg with respect to the circumstances of the matter that resulted in the criminal charges against [his] client, her thoughts with

respect to those facts, and her possible availability as an expert witness on behalf of [his] client.

The affidavits did not state that Silberg ever had been retained as an expert witness by the defense in the criminal case, and it is apparent that she was not retained.[3]

On August 31, 2009, the court issued an order that "the motion [*in limine*] is denied." It was entered the following day.[4]

When the parties appeared before a master on the September 3, 2009 trial date, it became apparent that there was confusion over whether the order denying the motion *in limine* was intended to leave the question whether Silberg could testify open for decision during trial or whether the order affirmatively precluded Silberg from testifying. Initially, the master issued her own ruling excluding Silberg as a witness and then denied Davis a requested continuance to designate a new rebuttal expert. After further discussion, however, the master conferred with counsel in chambers and then contacted the judge who had issued the order denying the motion *in limine*. The judge immediately amended the August 31, 2009 order by interlineation, to state: "It appearing that the above ruling [denying the motion *in limine*] was not clear to all parties, Dr. Silberg may not testify." The master then withdrew her own ruling and granted a continuance until November 23, 2009, suggesting that this would allow Davis to "retain an alternative rebuttal expert." The docket entries state that Davis's motion for a continuance to designate a new expert was denied, however, and do not otherwise reference a deadline for designating a new rebuttal expert.[5]

---

**3.** Neither party filed a memorandum of law or cited any pertinent legal authority.

**4.** The judge issuing the order was not the same judge who later presided over the merits hearing.

**5.** That docket entry likely refers to the master's original decision to deny the motion for continuance. After the in-chambers conference, it was apparent that the parties had agreed to a continuance.

On September 14, 2009, Davis designated Jennifer Wehberg, the medical doctor who had examined Sophia after Leffew had made the report to DSS, as both an expert witness in her case-in-chief and a possible rebuttal expert. Ten days later, Davis filed a motion to extend time to identify a rebuttal expert or, alternatively, to again postpone the trial. In the motion, she explained that she recently had changed counsel and now was being represented *pro bono* by the non-profit Sexual Assault Legal Institute ("SALI"). Her new lawyer was seeking another rebuttal expert and anticipated designating one in the next few days.

Petito opposed Davis's motion. Sophia's counsel did not oppose an extension of the deadline to name a rebuttal expert, but opposed any postponement of the trial date.

On October 26, 2009, the motion to extend time and/or postpone the trial date was denied. Davis had not identified another rebuttal expert before then.

As noted, the trial began on November 23, 2009. Davis did not renew her objection to the exclusion of Silberg's testimony. She also did not proffer to the court the testimony that Silberg would have offered to rebut Killeen's testimony.

On appeal, Davis contends the circuit court erred by applying an incorrect legal standard in deciding to preclude Silberg from testifying as an expert witness. The error was prejudicial, Davis maintains, because it left her without an expert witness to rebut Killeen's testimony. She posits that, for the court to preclude Silberg from testifying based upon Silberg's prior contact with Petito and his criminal defense lawyer, the court had to find 1) that it was objectively reasonable for Petito to believe he and Silberg had entered into a confidential relationship and 2) that Petito actually had shared confidential information with Silberg. Davis complains that the court made no such finding and, more important, there were no facts in evidence that could have supported such a finding.

Petito counters that this issue is not preserved for review because Davis failed to make a proffer of Silberg's testimony; even if the issue were preserved, the court did not abuse its

discretion or err in excluding Silberg; and, if there was an abuse of discretion or error, it was not prejudicial because Davis was afforded a full opportunity to designate a new rebuttal expert.[6]

We begin by considering the preservation issue. Rule 5–103, entitled "Rulings on Evidence," provides in pertinent part:

(a) **Effect of erroneous ruling.** Error may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling, and ... (2) ... [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer on the record or was apparent from the context within which the evidence was offered.

A Committee Note to the rule states that it "is not intended to preclude the making of objections or offers of proof by a motion *in limine*" and cites to the Court of Appeals' decision in *Prout v. State*, 311 Md. 348, 535 A.2d 445 (1988).[7]

In *Prout*, at the outset of a jury trial in a criminal case, before any witnesses were called, the defendant made an oral "motion in *limine*" seeking permission to cross-examine the complaining witness about her prior criminal convictions. The trial court denied the motion, which had the effect of excluding the evidence.[8] When the complaining witness later was called

---

6. Petito also suggests that exclusion would have been proper in any event because Silberg was not timely designated. As mentioned, *supra*, in the proceedings below, Petito did not object to Silberg's designation as being untimely. As this issue was not raised or decided in the circuit court, it is not preserved for review and we decline to consider it. Md. Rule 8–131(a).

7. The Maryland Rules of Evidence, including Rule 5–103, were adopted in 1994, after the decision in *Prout*. *See Drake v. State*, 186 Md.App. 570, 593, 975 A.2d 204 (2009)(discussing the history of Rule 5–103), *rev'd on other grounds by Charles & Drake v. State*, 414 Md. 726, 997 A.2d 154 (2010).

8. As the Court of Appeals noted, the motion *in limine* was not typical as it sought to admit evidence, rather than to exclude it. 311 Md. at 355

to testify, the defendant did not renew his motion, attempt to cross-examine the witness about her prior convictions, or make a proffer to the court.

The Court of Appeals held that the propriety of the trial court's ruling was preserved for appellate review, opining:

Whether a trial judge's ruling granting a motion *in limine* may be reviewed on appeal when there is no subsequent proffer of the evidence at trial presents a question of first impression in this Court. Typically, a motion *in limine* is a motion made before or during a jury trial outside of the hearing of the jury, the purpose of which is to prevent the jury from hearing certain questions and statements that are allegedly prejudicial to the movant. Specifically, the motion usually seeks an order restricting opposing counsel from offering questionable evidence before the judge has had an opportunity to rule on its admissibility. Evidence is most often sought to be excluded because it is incompetent, irrelevant, immaterial, privileged, or otherwise inadmissible. *See generally McCormick on Evidence* § 52, at 128 (E. Cleary 3d ed.1984). Thus, the real purpose of a motion *in limine* is to give the trial judge notice of the movant's position so as to avoid the introduction of damaging evidence which may irretrievably infect the fairness of the trial.

Obviously, the trial judge may either grant or deny the motion. If the trial judge admits the questionable evidence, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review. However, when the trial judge resolves these motions by clearly determining that the questionable evidence will *not* be admitted, and by instructing counsel not to proffer the evidence again during trial, the proponent of the evidence is left with nothing to do at trial but follow the court's instructions. Under these circumstances, the court's ruling controls the subsequent

n. 4, 535 A.2d 445. In the instant case, Davis's motion *in limine* was likewise atypical.

course of the trial and the proponent's objection is preserved for review without any further action on his part. *Id.* at 355–56, 535 A.2d 445 (footnote omitted). *See also J.L. Matthews, Inc. v. Maryland–National Capital Park and Planning Comm'n,* 368 Md. 71, 106 n. 29, 792 A.2d 288 (2002) (stating that it is "well-established that after the judge's preclusion of the evidence [on a motion *in limine* ], Petitioner was not required to proffer that evidence at trial.").

In *Simmons v. State,* 313 Md. 33, 542 A.2d 1258 (1988), decided soon after *Prout,* the Court held that a claim of error in the granting of a motion *in limine* precluding the appealing party's expert witness from testifying was preserved for review without a proffer being made during trial. In *Simmons,* at the outset of trial, the State moved *in limine* to preclude the defendant from calling his proposed expert in psychiatry. After the jury was selected, and during a recess, the court heard argument on the motion. Defense counsel explained that he intended to call the psychiatrist to testify about the nature of the defendant's subjective beliefs at the time he committed the crime. The court ruled that the expert could not testify.

The trial continued and defense counsel never sought to call the psychiatrist as a witness or to proffer her testimony. On appeal after conviction, the defendant contended that the court's ruling precluding the psychiatrist's testimony was in error. The State responded, *inter alia,* that the issue was not preserved for review. Ultimately, the Court of Appeals held that, once the court granted the motion *in limine,* the defendant was not required to call the expert witness to the stand or to further proffer her testimony. The Court explained that, when a judge has ruled on a motion *in limine* by excluding the evidence in question, and intends the ruling to "be final" and unconditional, then to require the proponent of the evidence "to make a more specific proffer or to offer the evidence again during the trial in order to preserve the issue for appellate review is unwarranted and would unduly interfere with the orderly progression of the trial." 313 Md. at 38, 542 A.2d 1258.

■ In the case at bar, *Prout* and *Simmons* control the outcome of the preservation issue. The prehearing ruling denying the motion *in limine,* and hence directing that Silberg would not be permitted to testify, was a final and unconditional ruling, as the September 3, 2009 amendment to the August 31, 2009 order denying the motion *in limine* made clear.[9]

As discussed, *supra,* Davis filed a motion *in limine* asking the court to permit Silberg to testify. The motion was denied by line order. She subsequently argued the issue before the master originally assigned to the case, resulting in the court's issuing a revised order clarifying that Silberg would not be allowed to testify at the merits hearing. When the merits hearing eventually commenced, Davis did not raise the issue again or otherwise proffer to the court the testimony that Silberg would have given. Under the authority of *Prout* and its progeny, however, she was not obligated to make a proffer once the court had finally ruled on her motion *in limine.*

Petito argues, in tandem with his failure to timely object argument, that Davis failed to proffer to the trial court the substance of Silberg's expected testimony. For the same reasons we have discussed above, a proffer was not required at that time. Petito's written and filed amended designation of Killeen as a rebuttal expert witness stated that she would "opine that the protocol, standard of practice, information gathering techniques, interview process, investigation and extensive forensic evaluations of [Sophia] as it relates to sexual abuse was not appropriately conducted and that there was no reliable information to conclude [Sophia] was sexually abused."

---

**9.** We recognize that in this case, unlike in *Prout and Simmons,* the *in limine* ruling was made pretrial and was not made by the judge who presided over the merits hearing, which began almost three months later. We do not think that this distinction makes a difference when the "evidence" at issue is the entire testimony of a witness. Davis clearly was informed by the amended August 31, 2009 order that Silberg would not be permitted to testify, and she and Petito had every reason to think that that ruling was definitive. Under the circumstance, it would be unreasonable to require her to call Silberg to testify at the hearing to preserve her objection to the ruling on the motion *in limine.*

Davis's written designation of Silberg, filed two days later, stated that Silberg would be called "to rebut the opinions, findings and testimony of [Killeen]...." Accordingly, when the ruling on the motion *in limine* was made, before the first scheduled trial date, the court knew that Silberg would testify that the interviews and evaluations of Sophia by Leffew and Smith were appropriately conducted and that there was reliable information to conclude that Sophia was sexually abused. This amounted to an adequate proffer of Silberg's anticipated testimony.

 We now turn to the substantive question whether Silberg properly was precluded from testifying as an expert witness for Davis based on her prior contact with Petito. In Maryland, the trial court is vested with broad discretion in ruling on whether to admit or exclude expert testimony. *Massie v. State,* 349 Md. 834, 850–51, 709 A.2d 1316 (1998). On review of such a decision, we only will reverse a judgment upon a determination that the trial court abused its discretion or made an error of law or "some serious mistake." *Franch v. Ankney,* 341 Md. 350, 364, 670 A.2d 951 (1996).

In advancing her argument that the trial court erred in precluding Silberg from testifying, Davis primarily relies upon *Butler–Tulio v. Scroggins,* 139 Md.App. 122, 774 A.2d 1209 (2001). In that case, the plaintiff cut her wrist on a piece of glass and was operated on by Scroggins, a defendant. Afterward, the plaintiff continued to experience pain and eventually underwent a second surgery performed by another doctor. The second doctor discovered that a micro-surgical suture needle had been left in the plaintiff's wrist during the first surgery.

Two years after the second surgery, the plaintiff consulted with a plastic surgeon, complaining of continuing weakness, abnormal sensation, and decreased movement in her hand. The plastic surgeon (Dr. Leuthke) advised the plaintiff that she was suffering from a median nerve injury. He did not recommend further surgery, however. At the end of the consultation, the plaintiff asked Leuthke if he " 'could support

her claim of negligence'" against Scroggins and the hospital where her first surgery had been performed. *Id.* at 132, 774 A.2d 1209. Leuthke replied that the micro-surgical needle left in the plaintiff's hand during that surgery would have had "little, if any effect" on her current condition and that he could not support her claim. *Id.*

The plaintiff sued Scroggins and the hospital for medical negligence. At trial, she called two expert witnesses. Over objection, the defendants called Leuthke to testify as an expert. He testified consistent with the opinion he had given the plaintiff. He also testified that his impression after examining the plaintiff was that she was "hoping for someone or a physician to support her claim of negligence." *Id.* at 134, 774 A.2d 1209. The jury returned a verdict in favor of the defendants.

On appeal, the plaintiff argued that the trial court had abused its discretion in permitting Leuthke to testify as an expert witness against her. She asserted that 1) as her treating physician, Leuthke owed her a fiduciary duty, which he violated by testifying for her opponent; 2) the probative value of Leuthke's testimony was outweighed by its prejudicial effect; 3) allowing Leuthke to testify threatened the integrity of the judicial process; and 4) Leuthke had had an improper *ex parte* contact with the defendants' lawyers.

Relying largely upon the absence of a physician-patient privilege in Maryland, we held that Leuthke did not violate any fiduciary duty. As to the probative value issue, we pointed to civil cases in Maryland in which experts retained by one party, but not actually called to testify by that party, were allowed to be called as witnesses for the other party. *See Rubin v. Weissman,* 59 Md.App. 392, 403, 475 A.2d 1235 (1984). We noted, moreover, that the Court of Appeals has held that an expert witness called by one party can testify that he or she previously had been retained as an expert by the other party. *See Mayor and City Council of Baltimore v. Zell,* 279 Md. 23, 28, 367 A.2d 14 (1977) (defendant in condemnation action permitted to elicit testimony from an appraiser

that he previously had been retained as an expert for the City); *Levitsky v. Prince George's County,* 50 Md.App. 484, 495, 439 A.2d 600 (1982) (County permitted to elicit testimony in a condemnation action that an appraiser testifying on its behalf previously had been retained by the defendant). Observing that Leuthke had not been retained as an expert witness by the plaintiff, we rejected the contention that the plaintiff had been unfairly prejudiced by his testimony on behalf of her adversary.

As to the integrity of the judicial process, we looked to two federal district court civil cases cited by the plaintiff. In the first, *W.R. Grace & Co. v. Gracecare, Inc.,* 152 F.R.D. 61 (D.Md.1993), corporate counsel for W.R. Grace, the plaintiff, had contacted a trademark attorney by telephone to retain his services to assist with trial preparation in the particular trademark case at issue (and another trademark matter). Corporate counsel had discussed the marks at issue, some legal issues that had arisen, arguments being made by the defendants, and "some of" lead outside counsel's and corporate counsel's thoughts "on certain issues in the case." *Id.* at 63. W.R. Grace's corporate counsel testified that he thought an attorney-client relationship had been formed between W.R. Grace and the trademark attorney with respect to the trademark case and that they would be communicating further about it. W.R. Grace paid the trademark lawyer for the 30 minutes the telephone call lasted.

About a month later, the same trademark attorney was retained as an expert witness by the defense in the trademark case. W.R. Grace filed a motion to disqualify him. The defense filed an opposition in which defense counsel asserted, by affidavit, that the expert had told him that he briefly had discussed a case with corporate counsel for W.R. Grace, but not any substance or theories or even the names of the defendants, and that he had assumed when he did not hear anything more that he was not being retained.

Explaining that it had "the inherent power to disqualify experts" and that that power derived from "the necessity to

protect privileges which may be breached when an expert switches sides," the court granted the motion to disqualify the trademark attorney as an expert witness for the defense. *Id.* at 64. Applying a two-part test previously adopted in *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 278 (S.D.Ohio 1988), the court stated that it was required to

> determine whether the attorney or client acted reasonably in assuming that a confidential relationship of some sort existed [with the expert], and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate.

*Id.* (internal quotation omitted). The court presumed that such a relationship is sufficiently "substantial" when "there is 'a reasonable probability that confidences were disclosed' which could be used adversely later." *Id.* at 65 (quoting *Stitz v. Bethlehem Steel Corp.*, 650 F.Supp. 914, 916 (D.Md.1987)). It also emphasized the expert's status as an attorney, observing, "Where there is a confidential relationship with an attorney-expert, a court should search for the reasonable probability that the attorney-expert has confidences on the matter at issue, and not simply that confidences passed." *Id.*

In the second case, *Cordy v. Sherwin–Williams Co.*, 156 F.R.D. 575 (D.N.J.1994), the plaintiff was injured in a bicycle accident on a railroad crossing owned by the defendant. He retained as an expert a forensic engineer who specialized in bicycle accidents. Plaintiff's counsel gave the expert a three-ring binder documenting his investigation, including his impressions of the case, witness interviews, and a report by another expert witness. The expert billed the plaintiff for 27 hours of work and rendered at least one oral opinion to plaintiff's counsel. He later resigned and refunded his retainer. Subsequently, he was retained by defense counsel. The plaintiff then moved to preclude him from testifying.

The district court noted that the party seeking disqualification bears the burden of establishing the existence of a confidential relationship with the expert. The court applied a two-part test similar to that used in *W.R. Grace, supra:*

"First, was it objectively reasonable for the first party who retained the expert to believe that a confidential relationship existed? Second, did that party disclose any confidential information to the expert?" *Id.* at 580 (citing *Paul, supra,* 123 F.R.D. at 279). The court also considered the competing policy objectives when expert disqualification is at issue. It concluded that both prongs of the test had been satisfied, opining that it was a clear cut case given that the expert actually had been retained by the plaintiff.

This Court declined to extend the *W.R. Grace* holding to the facts in *Butler–Tulio.* We reasoned that the *W.R. Grace* case was distinguishable because the expert witness there was an attorney and the existence of an attorney-client privilege was outcome determinative. We also distinguished *Cordy* because the plaintiff in *Butler–Tulio* never had retained Leuthke as an expert witness and because, unlike in *Cordy,* when significant disclosures had been made, Leuthke had been given "only a bare bones medical history and description of appellant's claim." *Butler–Tulio, supra,* 139 Md.App. at 149, 774 A.2d 1209. Ultimately, we affirmed the trial court's decision allowing Leuthke to testify.

The case at bar, like *Butler–Tulio* and the other cases discussed above, is a civil action. Unlike any of those cases, however, the initial contact with Silberg, the expert witness at issue, happened in the context of a criminal case, with the contact being made by the criminal defendant (Petito) and his defense counsel. The Maryland body of caselaw pertaining to expert witness disqualifications in criminal cases differs markedly from the caselaw on that issue in civil actions.

In *State v. Pratt,* 284 Md. 516, 398 A.2d 421 (1979), *superseded by statute on other grounds,* defense counsel in a murder case retained a psychiatrist to examine the defendant to render an opinion as to whether she was insane when she shot and killed her husband. Criminal agency was not disputed and the outcome of the trial depended upon a jury's finding on sanity. The psychiatrist opined that the defendant had not been insane at the time of the homicide. At trial, the State

attempted to call the psychiatrist as its own witness. The defendant objected on the ground of attorney-client privilege. The trial court overruled the objection and permitted the State to call the psychiatrist to the stand.

On appeal after a finding of sanity and a conviction, this Court reversed, holding that the defendant's communications with the psychiatrist were within the scope of the attorney-client privilege. *Pratt v. State,* 39 Md.App. 442, 446–51, 387 A.2d 779 (1978). The Court of Appeals agreed. It held that the scope of the attorney-client privilege extends to agents whose services are required by counsel for a criminal defendant to properly prepare the client's case for trial. The Court explained:

> Initially, we observe that, given the complexities of modern existence, few if any lawyers could, as a practical matter, represent the interest of their clients without a variety of nonlegal assistance. Recognizing this limitation, it is now almost universally accepted in this country that the scope of the attorney-client privilege, at least in criminal causes, embraces those agents whose services are required by the attorney in order that he may properly prepare his client's case. Consequently, in line with the views of the vast majority of the courts in our sister jurisdictions, we have no hesitancy in concluding that in criminal causes communications made by a defendant to an expert in order to equip that expert with the necessary information to provide the defendant's attorney with the tools to aid him in giving his client proper legal advice are within the scope of the attorney-client privilege.

284 Md. at 520, 398 A.2d 421 (citations omitted). Indeed, the State in *Pratt* did not dispute that the defendant's communications with the psychiatrist were within the scope of the attorney-client privilege. Its contention was that the privilege had been waived. The Court concluded that it had not, and that the trial judge should have precluded the State from calling the psychiatrist retained by the defense as an expert at trial.

Likewise, in *Rubin v. State,* 325 Md. 552, 602 A.2d 677 (1992), the Court of Appeals held that certain information a private investigator had gained in the course of his retention by the defendant was protected by the attorney-client privilege and therefore the trial court had erred in allowing an employee of the investigator to testify as a State's witness about the information. The defendant had hired the investigator in the course of a divorce action, to find out whether her husband was committing adultery. As she became friendly with the investigator, she told him that she herself had had an affair and that her husband had tried to poison her boyfriend. The investigator referred her to a criminal defense attorney, whom she retained. The attorney contacted prosecutors, gave them the information about the attempted poisoning, and obtained a commitment that the client would not be prosecuted in connection with the attempted poisoning if she cooperated with police and told the truth about the situation.

Meanwhile, the defendant arranged a meeting with her husband and shot and killed him. She then contacted the investigator, who arrived with one of his employees, and showed him the body. At the investigator's urging, she contacted her attorney, who also came. Later that evening, when they all were together, the investigator's employee saw six rounds of live .22 caliber ammunition in the defendant's handbag. He contacted the police and, following an investigation, the defendant was indicted for murder. At trial, the State presented evidence that the victim had been killed with a .22 caliber handgun and called the investigator's employee to testify about the live rounds he had seen in the defendant's purse on the night of the shooting. Over objection, the court allowed that evidence in. The defendant was convicted.

On appeal, one of the defendant's contentions was that the trial court had erred in allowing the State to call the investigator's employee to testify about what he had seen in the defendant's purse. The Court of Appeals, relying upon *Pratt,* agreed that, for purposes of the criminal charges against the defendant arising out of the shooting death of her husband, the communications, including all information passed between

the defendant and the investigator (and his employees), were covered by the attorney-client privilege. Accordingly, the trial court had erred in allowing the State to call the investigator's employee as a witness. The Court of Appeals held that the error was harmless, however, because there was other overwhelming evidence against the defendant.

This Court was presented with a similar question in *Morris v. State*, 59 Md.App. 659, 477 A.2d 1206 (1984). There, the defendant was found guilty of murder and arson. Before trial, defense counsel had retained a scientific expert to analyze the contents of a stain on the shirt the defendant had been wearing at the time of the crime. Because the defense refused to stipulate to chain of custody, the court ordered the prosecutor to deliver the shirt to the laboratory where the tests were to be performed and to be present during the testing. Apparently, the testing yielded a result that was not helpful to the defendant but was helpful to the State. When the State subpoenaed the expert witness to testify at trial, the defense filed a motion to quash on the ground that allowing the State to call the witness as its own expert at trial would violate the attorney-client privilege. The trial court denied the motion and permitted the expert witness to testify at trial on behalf of the State.

On appeal, we affirmed the judgment. We distinguished *State v. Pratt* on the ground that the expert witness's opinions, based on the tests he performed on the shirt, were purely scientific and did not depend upon any disclosures by the defendant:

> [T]he experiments conducted by the expert with the shirt worn by the defendant and the opinions he reached as a result of these scientific explorations were not predicated upon any information furnished by the defendant to either his attorney or to the expert and were not therefore protected by the attorney-client privilege.

59 Md.App. at 669, 477 A.2d 1206. We further distinguished the case on the ground that there were special circumstances in that the experiments performed on the shirt had resulted in

its destruction, which meant the State could not have the shirt tested by an expert of its own.

■ We return to the case at bar. Davis maintains that the trial court erred by not applying the two-part test—1) was a confidential relationship formed; and 2) if so, were confidences communicated—that this Court referenced in *Butler–Tulio* in discussing the *W.R. Grace* and *Cordy* cases; and that, under that test, Silberg clearly should not have been precluded from testifying. We disagree. We conclude that, had the court applied the two-part test, its ruling would not have differed. Thus, the trial court did not abuse its discretion or err in precluding Davis from calling Silberg as an expert witness at trial.

To be sure, the Maryland civil cases addressing whether an expert witness consulted by one party can be called to testify by the opposing party have taken a liberal approach, with, as noted, some cases freely allowing not only such a practice but also the admission of evidence that the expert previously had been retained by the other party. And, in *Butler–Tulio*, the most recent of the civil cases addressing this issue, the initial contact of the plaintiff with the expert in question did not involve the plaintiff's lawyer; it was arranged by the plaintiff herself as an ordinary doctor's visit in which, only at the end of the examination, did the plaintiff ask the doctor his opinion about the treatment rendered by the surgeon who had operated upon her previously; and there was no mention by the plaintiff to the doctor about any pending litigation. The evidence was ambiguous as to whether the plaintiff had approached the doctor as a "treating physician" and was equally ambiguous as to whether she had approached the doctor as an expert witness. Moreover, the plaintiff gave the doctor a minimal amount of information about her prior surgery. Under the circumstances, the plaintiff could not have had a reasonable expectation that her communications with the doctor were confidential.

In the case at bar, the uncontroverted evidence about Petito's prior contact with Silberg was that it happened in the

course of a criminal case pending against him; it was initiated by Petito and his criminal defense lawyer; they both spoke with Silberg over the telephone; and they both spoke to her about the facts of the case and "her thoughts" with respect to the circumstances of the case. Silberg's attested lack of memory of this telephone conversation is not proof that it did not take place; and Petito could not have been expected to give a more detailed account of the conversation given that the criminal charges still were pending against him when he and his counsel submitted their affidavits in the domestic case, notwithstanding that they had been placed on the stet docket pending resolution of the modification proceeding, and he had an absolute right to remain silent under the Fifth Amendment.

Nevertheless, the affidavits established that Petito discussed the facts of the case with Silberg and with his lawyer, together, in the course of attempting to arrange for expert witness testimony with which to defend himself against criminal charges of sexual abuse of his daughter. In our view, the criminal case context of the communications Petito and his criminal defense lawyer had with Silberg make *State v. Pratt* and *Rubin v. State* highly relevant to the preclusion issue. Those cases stand for the proposition that, just as a criminal defendant would understand that his communication of the facts underlying the charges he faces are confidential under the attorney-client privilege when made to his lawyer, he reasonably would expect that the same disclosure of facts to the expert witness his lawyer is retaining to aid in his defense is confidential.

And, in our view, that expectation of confidentiality is no less reasonable, and no different, when the communications with the potential expert witness took place in a retention interview that did not result in retention of the expert. To be sure, there may be purely logistical reasons, unrelated to the substance of the case, why a particular expert witness cannot be retained to testify on behalf of a particular criminal defendant. For instance, the expert witness may be physically unavailable to testify in deposition or trial; he may charge at a rate that the defendant cannot afford; or he may have a

conflict. Absent such a situation, the expert witness will decide whether he or she can testify on behalf of the defendant based at least in part upon the facts of the case and the theories of defense, and therefore must be apprised of those facts and theories in order to make a retention decision. In such a situation, whether the expert's decision is for or against retention does not alter the defendant's reasonable expectation, when he and/or his counsel are revealing the facts and theories to the potential expert witness, that the disclosures are confidential. *Cf. Shadow Traffic Network v. Superior Court,* 24 Cal.App.4th 1067,1080, 29 Cal.Rptr.2d 693 (Cal.Ct. App.1994) (holding in the context of a civil case that "communications made to a potential expert in a retention interview can be considered confidential and therefore subject to protection from subsequent disclosure even if the expert is not thereafter retained as long as there was a reasonable expectation of such confidentiality") (footnote omitted).

Here, the facts before the trial court did not suggest that Silberg was not retained as an expert witness in Petito's criminal case because of a conflict or a logistical or financial reason unrelated to the facts and theories of the defense. On the contrary, the attestations showed that the substance of the defense case was communicated to Silberg, she conveyed "her thoughts with respect to those circumstances, and her availability as a possible expert witness," and she then was not retained as an expert for the defense.

Moreover, this case is unlike *Morris, supra,* in which we distinguished *Pratt* and held that an expert witness the defense in a criminal case had communicated with and had retained to perform tests could be called by the State as an expert at trial. The opinions that Silberg would be expected to express, about the competency *vel non* of the interview methods and techniques employed by the therapists who treated Sophia, whether Sophia's statements about the "monster" were disclosures of sexual abuse by her father, and whether the conduct of the therapists brought about the statements thought to be assertions of sexual abuse, rather than uncovered them, were not the kind of black or white

scientific testing evidence that would produce but one result regardless of the identity of the expert performing it.

Silberg's opinions would be fact-dependent and could be affected by facts disclosed by Petito. And, unlike in *Morris,* there were no "special" circumstances (there, the destruction of the shirt that was being tested) that resulted in Silberg's being the only expert witness who could render opinions on the disputed issues. There is nothing in the record of this case to suggest that, once the master granted a continuance, on September 3, 2009, Davis could not have quickly sought and retained another expert to rebut Killeen's expected testimony. (Indeed, she disclosed Wehberg as a potential rebuttal expert on September 14, and was permitted, but declined, to call her at trial; she then waited another 10 days to move for a continuance of the trial date for the purpose of finding another expert witness.)

For these reasons, we are of the view that the evidence before the trial court when the preclusion ruling was made was sufficient to support a rational conclusion that Petito reasonably would have expected his relationship with Silberg, as defined by the telephone call in which, with his lawyer, he discussed the facts underlying the criminal charges against him, was confidential just as his conversations with his lawyer about those facts were confidential. We further conclude that the evidence before the trial court was sufficient to show that confidential communications in fact were made by Petito to Silberg. Certainly, Petito's rendition of the facts of the case was a confidential communication, from his perspective. He related the facts of the case as he knew them to Silberg in order to gain her assistance in defending him against the sexual abuse charges. Again, whether or not Silberg at a later time remembered these disclosures does not mean that they were not made or that they were not confidential. (It also does not mean that she would not, once she was involved in the case as a State's witness and had developed a familiarity with it, come to remember what Petito and his criminal defense lawyer had said to her.)

For all these reasons, we hold that the trial court did not abuse its discretion or commit legal error in ruling that Silberg could not testify as an expert witness on Davis's behalf.

## II.

### *Hearsay Ruling*

Davis next contends the trial court erred in ruling, on hearsay grounds, that Christy McGurgan, one of Sophia's therapists, could not testify about statements Sophia made to her during their therapy sessions. The statements were assertions by Sophia that McGurgan had interpreted as disclosures of sexual abuse by Petito.

Sophia began counseling with McGurgan in September 2009 under the parties' interim consent agreement. Before then, Sophia's lawyer had waived her counselor-client privilege with respect to communications she had made to Leffew and Smith.[10] Eventually, five days before trial, Sophia's lawyer waived her privilege with respect to her communications with McGurgan as well. Thereafter, Davis sought to call McGurgan as an expert witness in her case-in-chief. The trial court denied Davis's request to designate McGurgan as an expert, but ruled that she could call McGurgan as a fact witness.[11]

On December 9, 2009, Davis called McGurgan to the stand. After a brief *voir dire* examination by Sophia's lawyer, Davis's lawyer asked McGurgan some preliminary questions about her background and job duties. McGurgan explained how she had become Sophia's therapist and described her initial intake

---

10. Pursuant to Md.Code (2006 Repl.Vol., 2010 Supp.), section 9–109.1 of the Courts and Judicial Proceedings Article ("CJP"), a client of a "professional counselor" "has a privilege to refuse to disclose, and to prevent a witness from disclosing, communications relating to: (1) Diagnosis or treatment of the client; or (2) Any information that by its nature would show a medical record of the diagnosis or treatment exists."

11. Davis does not challenge the court's ruling that she could not call McGurgan as an expert witness.

meeting with Davis. She said she first met with Sophia on September 16, 2009, and the two went on to participate in a total of ten therapy sessions. She described Sophia's demeanor at their first session as "open," "friendly," and "confident."

Davis's lawyer asked McGurgan whether Sophia had learned during their first therapy session that she would be starting visitation with her father that coming weekend. McGurgan replied that they did discuss that topic. When counsel for Davis asked how Sophia had reacted to the upcoming renewed contact with her father, Petito objected on the basis that any statements made by Sophia to McGurgan were hearsay that could not be admitted into evidence for their truth. As counsel and the court discussed that objection it "morphed" into a somewhat more general objection to McGurgan's testifying about statements Sophia made to her in the course of their therapy sessions, in particular, statements that McGurgan interpreted to be disclosures of sexual abuse by Petito.

Davis argued then, as she does now, that Sophia's statements to McGurgan were admissible under Rule 5–803(b)(4), which is an exception to the rule against hearsay for

[s]tatements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

Petito countered that, given that by the time of the initial therapy session between Sophia and McGurgan it had been more than 11 months since Sophia had had any contact with him, any statement by Sophia to McGurgan was not contemporaneous with any alleged abuse and therefore was not "pathologically germane" to treatment.

The court allowed counsel for Petito to *voir dire* McGurgan about her understanding of her role in counseling Sophia. McGurgan testified that her role was to conduct "an initial

assessment and a diagnosis." She testified that "[a]s part of the therapy" she needed to determine if Sophia had been sexually abused and that she would "mold her therapy" based upon that information.

The trial judge decided that she needed additional time to research the hearsay issue, as the parties were not prepared to offer her any legal authority bearing on whether therapy with an LCPC should qualify as "medical treatment or medical diagnosis." The trial was continued until February 1, 2010. Later that same day, the court issued an interim order pertaining to Sophia's continuing therapy with McGurgan and the commencement of therapeutic visitation with Petito.[12] In the order, the court stated that Sophia would have a "confidential relationship" with McGurgan and that Sophia's counsel's prior waiver of the privilege "is hereby concluded, and shall not continue to have any force and effect until such time as a new waiver is filed."

On January 15, 2010, Sophia's lawyer filed a notice that she was invoking Sophia's privilege with respect to communications with McGurgan.

On January 27, 2010, Davis filed a memorandum of law addressing whether statements made by a patient to an LCPC should qualify under the hearsay exception in question. Davis cited federal caselaw suggesting that no distinction need be drawn between a psychiatrist and an LCPC.

Trial resumed as scheduled on February 1, 2010. Petito argued that, regardless of whether Sophia's statements to McGurgan were admissible under the hearsay exception in Rule 5–803(b)(4), McGurgan no longer could testify about any statement made by Sophia at any time, because Sophia's lawyer had invoked her privilege. The court decided it was not necessary to address that argument because it already had

---

12. Although the court previously had ordered therapeutic visitation, Davis had not complied with the order. Davis's lawyer represented to the court that McGurgan had contacted Davis and advised her that she did not think it was in Sophia's best interests to have visitation with her father.

concluded that Sophia's statements to McGurgan were hearsay and were not admissible under the exception for statements made for medical treatment or diagnosis in contemplation of treatment. The court explained:

> [G]iven the fact that, it seems to me that [Sophia] would not have understood her statements to be for medical purposes, medical diagnosis and treatment because of the nature of a child therapist interaction, that unless there was some evidence that she did so understand that those statements would not be admissible under the exception to the hearsay rule, so I concluded that those statements would not, just by virtue of having been made to a person who was qualified as a therapist, vis-a-vis, be admissible as an exception to the hearsay rule.
>
> So I don't believe that the substance of the child's statements, did they occur, would be admissible for the truth of the matter asserted by virtue of that relationship.

After Davis's lawyer reiterated her argument that statements to an LCPC could qualify as statements made for purposes of medical treatment or diagnosis, the trial judge explained that her ruling was not based on that aspect of the exception, but on whether Sophia understood that "her statements were made for the purposes of medical diagnosis and treatment." Davis's lawyer asked the court whether the ruling was based on Sophia's age when she made the statements to McGurgan (five years old) and the trial judge replied, "It's based on everything that I have before me in the case so far . . . [i]ncluding her age."

Davis argues that the trial court erred as a matter of law in ruling that Sophia's statements to McGurgan did not fall within the hearsay exception for statements made for purposes of medical treatment or diagnosis in contemplation of treatment because Sophia could not have understood that her statements were being made for those purposes when she made them. Petito responds that every statement Sophia made to McGurgan became privileged and therefore inadmissible when Sophia's lawyer re-invoked her privilege on Janu-

ary 15, 2010; and that, even if the statements in question were not privileged, they were properly excluded from evidence because they were not made for purposes of medical treatment or diagnosis in contemplation of treatment.

We begin by disposing of the privilege argument. There is no dispute that any statement that Sophia made to McGurgan after the December 9, 2009 trial date is privileged and inadmissible, because the interim order re-imposed the privilege and Sophia's counsel re-invoked the privilege after that point in time. Davis asserts, however, and we agree, that statements Sophia made to McGurgan prior to that time are not privileged because Sophia's counsel had waived the privilege for all statements Sophia had made to McGurgan up until that date. Contrary to Petito's argument, the court did not have the power to retroactively revoke the waiver of privilege as to those statements. After Sophia's lawyer waived her privilege, Davis and her lawyer spoke to McGurgan about her sessions with Sophia and McGurgan provided counsel for both Davis and Petito her entire case file. This intentional disclosure with the consent and direction of Sophia's lawyer was sufficient to waive any privilege with regard to all statements made by Sophia to McGurgan up to and including the December 9, 2009 trial date.

We now turn to the question whether Sophia's statements to McGurgan should have been admitted into evidence under the hearsay exception set forth in Rule 5–803(b)(4). Hearsay is an out-of-court statement offered in evidence for the truth of the matter asserted. *Ali v. State*, 314 Md. 295, 304, 550 A.2d 925 (1988). As noted, the hearsay exception at issue covers statements made for the purposes of medical treatment or diagnosis in contemplation of treatment. The underlying rationale for this hearsay exception is that " 'the patient's statements are apt to be sincere and reliable because the patient knows that the quality and success of the treatment depends upon the accuracy of the information presented to the physician.' " *Webster v. State*, 151 Md.App. 527, 536, 827 A.2d 910 (2003)

(quoting *In re Rachel T.*, 77 Md.App. 20, 33, 549 A.2d 27 (1988)).

▮▮▮ As we have explained, the hearsay exception for statements made for purposes of medical treatment or diagnosis

> specifically contemplates the admission of statements describing how the patient incurred the injury for which he is seeking medical care. For example, "if the doctor needed to know the source of the injury in order to determine treatment ..., the patient's statement as to source should be admissible, particularly if the doctor told the patient that the information was necessary for proper treatment." 6A Lynn McClain, *Maryland Evidence* § 803(4):1, at 218 (2d ed.2001) (collecting cases).

151 Md.App. at 527, 827 A.2d 910. Only statements that are "pathologically germane" to the patient's diagnosis and treatment are admissible under the Rule 5–803(b)(4) hearsay exception. *See State v. Coates*, 405 Md. 131, 144–45, 950 A.2d 114 (2008). The exception embraces "[o]nly statements that are both **taken and given** in contemplation of medical treatment or medical diagnosis for treatment purposes." *Webster*, 151 Md.App., at 537, 827 A.2d 910 (emphasis in original). The patient's subjective intent in making the statement sought to be admitted under the exception therefore is relevant to whether the exception applies.

▮▮▮ The trial court in the case at bar concluded that Sophia's statements to McGurgan about what, if any, sexually abusive acts had transpired between her and her father did not fall within the scope of the hearsay exception at issue because Sophia did not understand that she was making the statements for the purpose of medical treatment or diagnosis in contemplation of medical treatment. The court based its ruling on all of the evidence before it, including Sophia's age. Sophia was five when she began treatment with McGurgan in September 2009, and turned six shortly thereafter.

Davis faults the trial court for ruling that Sophia's age necessarily was dispositive of whether the hearsay exception

at issue applied. If the court had so ruled, we would agree that there was an abuse of discretion. We have held on more than one occasion that children younger than Sophia may have the ability to understand that statements they make to a doctor or nurse are for purposes of medical treatment or diagnosis in order to receive treatment.[13] *See Griner v. State,* 168 Md.App. 714, 746, 899 A.2d 189 (2006) (child age four years and eight months able to understand that statements to a nurse about abuse were made for medical reasons); *Rachel T., supra,* 77 Md.App. at 35, 549 A.2d 27 (almost five-year-old child capable of understanding that statements made to a doctor were made for purposes of medical diagnosis or treatment). The trial judge in the case at bar did not rule that Sophia's age necessarily was dispositive of the application *vel non* of the hearsay exception at issue, however, nor did she base her ruling solely upon Sophia's age.

As Davis recognizes in other parts of her argument, the judge also based her decision upon a finding that the nature of the child/therapist relationship itself would have made it difficult for Sophia to understand that her statements were being made for the purpose of medical treatment, even assuming that treatment sessions with a counselor constitute medical treatment.[14] Davis argues that the evidence presented established that Sophia understood that she was seeing McGurgan to prepare her for, and help her cope with anxiety related to, resumed visitation with Petito. She likens this case to *Griner* and *Rachel T.,* in which we affirmed rulings applying the hearsay exception for statements made for purposes of medical treatment or for diagnosis in contemplation of treatment and admitting statements made by children to health care providers on that basis.

---

13. In the instant case, there also was considerable evidence that Sophia was developmentally precocious.

14. While the court did not expound upon this subject, there was evidence before it about the nature of Sophia's sessions with her previous therapist, Leffew, that the court may have been taking into account in assessing what Sophia would have understood about the purpose of her therapy.

The *Griner* and *Rachel T.* cases bear little resemblance to the case at bar. In *Griner,* 168 Md.App. 714, 899 A.2d 189, after receiving a report communicating concern for the welfare of the victim, the police responded to the house in which the victim, a boy aged four years, eight months, was living with his grandmother. They found the victim with a swollen, partially shut, eye and a cut over the eye that had been crudely stitched. When the grandmother's explanation for the child's injuries and treatment did not make sense, the police called an ambulance and the child was transported to the hospital. After he was examined in the emergency room and evidence of other, older injuries was found, a decision was made to admit him. In the course of being interviewed by the pediatric admitting nurse, the victim disclosed that his grandmother had hit him, causing the injuries to his eye and the cut on his face (which she herself had stitched), and that she also had caused his earlier injuries by hitting him with a stick. The court admitted those statements into evidence under the hearsay exception at issue here.

On appeal after being convicted of assault, the grandmother argued that the victim's statements to the pediatric admitting nurse should not have been admitted into evidence under the hearsay exception for statements made for the purpose of medical treatment or diagnosis. We rejected that contention, holding that the evidence adduced supported a finding that the victim, although quite young, could understand the nature of his injuries (bruising, a swollen eye, a cut above his eye), that he was in the hospital to have his injuries treated, and that he was telling the pediatric admitting nurse about the source of his injuries to help in getting treatment for his injuries.

In *Rachel T.,* 77 Md.App. 20, 549 A.2d 27, the child victim was a few weeks away from turning five years old. When blood was found on her underwear and in the toilet, the little girl was taken to the pediatrician, who suspected that she had been sexually abused. The next day, the child was taken to a rape center to be seen by a pediatric gynecologist. In conformity with his routine practice, the pediatric gynecologist first had a social worker interview the child about her medical

history. At the outset of the interview, the social worker told the child that the reason for the upcoming examination by the doctor and for the questions she was about to ask was "because we were worried and wanted to see why there had been blood in her panties and in the toilet." *Id.* at 35, 549 A.2d 27. When the social worker asked the child about the source of her bleeding, she responded that "she had a secret with her Dad and that if she told her Mom her father would be in big trouble." *Id.* at 25, 549 A.2d 27. The child's disclosure was recorded in her chart. The pediatric gynecologist then performed his examination, which revealed physical evidence of "on-going sexual abuse." *Id.*

In a Child In Need Of Assistance case brought by the local department of social services, the juvenile court ruled that the child's statement to the social worker was hearsay that was not admissible. On appeal, we reversed, holding that the child's statement to the social worker should have been admitted under the statements for purposes of medical treatment or diagnosis exception to the rule against hearsay. We reasoned that the child knew from what the social worker had told her that the information she would give "would be used to provide appropriate treatment." *Id.* at 35, 549 A.2d 27. We noted further:

Additionally, the persistent bleeding probably affected [the child]—the universally frightening nature of the unexplained blood would have disturbed her and made her apt to tell the truth in order to become better. Granted, by the time [the child] saw [the pediatric gynecologist], the bleeding had stopped, but it was recent enough to retain its sobering character.

*Id.*

In the case at bar, unlike in *Griner* and *Rachel T.*, there was no evidence of any physical symptom or injury suffered by Sophia that a child of a young age would be capable of knowing would need treatment; and of course there was no evidence of a very brief interval between the onset of any symptom or injury and the visit to the health care provider

during which the statement at issue allegedly was made. Nor was there evidence of a brief interval between the alleged acts of abuse and the visit to the health care provider to whom the statements were made. Indeed, as Petito maintains, the evidence was to the contrary. The acts he was alleged to have committed had to have taken place, if at all, at least 11 months before Sophia's first visit to McGurgan, as he had not had any contact with Sophia during the past 11 months.

Also, counseling is not a medical intervention that a young child necessarily would recognize as a treatment for an injury or harm, like medical treatment for a swollen and bruised eye or for vaginal bleeding. This is especially the case when nearly a year has passed between the allegedly injurious acts and the therapy.

Unlike in *Rachel T.*, here there was no evidence adduced or even proffered about the nature of McGurgan's therapy sessions and, in particular, whether McGurgan had talked to Sophia about the purpose of the therapy or whether Sophia had evidenced any understanding of why she was meeting with McGurgan, as it would pertain to alleged acts of abuse. The fact that Sophia's upcoming renewed visitation with her father (which in fact did not take place) was a topic of discussion during her first counseling session with McGurgan did not mean that Sophia was giving whatever statements she was making to McGurgan with the understanding that they were for the purpose of treatment or diagnosis, especially given Sophia's young age.

This case also is unlike *Webster, supra,* 151 Md.App. 527, 827 A.2d 910, in which we affirmed a trial court's ruling allowing into evidence statements that a four-year-old made to a SAFE nurse. When a neighbor of the little girl discovered the defendant fondling the little girl in the bathroom, the neighbor immediately contacted the girl's mother, and the police were called. The police took the child to a hospital, where she was questioned by the SAFE nurse. The girl told the nurse, in essence, that the defendant had licked her vagina. We held that, because the victim was "questioned in

emergent circumstances, within a few hours of the assault, in a hospital setting," and the interview was conducted by a registered nurse and was immediately followed by a medical examination, there was adequate circumstantial evidence to support a finding that the child understood that she was giving information to the nurse about what had happened to her so that she would receive treatment. *Id.* at 551, 827 A.2d 910. None of the factors that constituted circumstantial evidence in *Webster* are present in the case at bar.

Finally, the case that most resembles the instant case, and in which we held a trial court had erred in allowing a child's statements to come into evidence, is *Coates v. State,* 175 Md.App. 588, 930 A.2d 1140 (2007). In that case, the child victim of sexual abuse was almost eight years old when she told a SAFE nurse that the defendant had abused her. The examination by the SAFE nurse took place 14 months after the last alleged act of sexual abuse, at a time when the victim had "no physical manifestations of illness or injury." *Id.* at 628, 930 A.2d 1140. Concluding that the hearsay exception for statements made for purposes of medical treatment or diagnosis did not apply, we explained:

[G]iven the long delay between the last incident of abuse and the examination, coupled with the fact that [the child] was not exhibiting any symptoms of illness, there is no indication that she understood that there was a medical purpose for the examination. The significant lapse of time between the alleged abuse and [the child's] statements to the [SAFE nurse] raises concerns as to the circumstantial guarantee of reliability that undergirds the [hearsay] exception. Because we cannot say that [the child] comprehended that there was a medical purpose for [the SAFE nurse's] examination, the statements were not admissible under Rule 5–803(b)(4).

*Id.* at 629, 930 A.2d 1140 (footnote omitted). Likewise, in the case at bar, Sophia's statements to McGurgan were not admissible under the hearsay exception embodied in Rule 5–803(b)(4). Accordingly, the trial court did not err or abuse its discretion in ruling the statements inadmissible.

## III.

### *Attorneys' Fees Award*

As noted above, the trial court ordered Davis to pay $30,773.54 of Petito's attorneys' fees, pursuant to Md.Code (2006 Repl.Vol., 2010 Supp.), section 12–103(b) of the Family Law Article ("FL"). In her last contention, Davis maintains the court's award of fees was a legal error.

In her April 16, 2010 Memorandum Opinion, the trial judge decided as follows on the issue of attorneys' fees:

> The Court may order attorneys fees under [FL] § 12–103 [ ], but not before considering the financial status of each party, the needs of each party, and whether there was substantial justification for bringing or defending the proceeding. *Lieberman v. Lieberman,* 81 Md.App. 575, 601 [568 A.2d 1157] (1990). The Court acknowledges that each party has expended significant financial resources as a result of this case. Mr. Petito, however, has suffered disproportionate financial hardship from these proceedings. His counsel was privately retained, unlike Ms. Davis's representation, which has been without change since approximately October 2009. He has exhausted his savings, credit, and taken loans in excess of $10,000 from his family. There can be no doubt that the needs of both parties are high, especially in light of the resources expended during these proceedings. The Court finds that Mr. Petito had a substantial justification in defending himself in these proceedings, initiated by Ms. Davis. While the Court recognizes the struggle that any parent must have when believing their child has been sexually abused, particularly when the suspected abuser is the other parent, the Court ultimately was unable to make a finding that the evidence supported that sexual abuse occurred. Without defending himself, Mr. Petito risked losing his parental relationship with Sophia. By contrast, Ms. Davis was represented pro bono by SALI, and should bear shared responsibility for the legal fees according to her income in light of the full record herein.

The court went on to find that Petito's incurred fees, including expert witness fees, of $76,052 were "fair, reasonable and necessary." It calculated its fee award to Petito by subtracting from that sum $9,153 that Davis had incurred in fees prior to being represented *pro bono*,[15] arriving at $66,899, and then multiplying that by Davis's percentage of the total incomes of the parents—.46—as reflected on the child support guidelines worksheet, arriving at $30,773.54.

FL section 12–103, entitled "Award of costs and counsel fees," provides in relevant part:

(a) *In general.*—The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:

(1) applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties. . . .

(b) *Required considerations.*—Before a court may award costs and counsel fees under this section, the court shall consider:

(1) the financial status of each party;

(2) the needs of each party; and

(3) whether there was substantial justification for bringing, maintaining, or defending the proceeding.

(c) *Absence of substantial justification.*—Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending the proceeding, and absent a finding by the court of good cause to the contrary, the court shall award to the other party costs and counsel fees.

---

**15.** Davis states in a footnote that her paid legal fees actually amounted to $9,513, not $9,153. She points to the fact that Petito used the higher figure in his written closing argument filed in the circuit court. Thus, it appears that the judge transposed two numbers in her memorandum opinion. Utilizing the correct figure, Davis's share of the fees would have been $30,607.94 (($76,052–$9,513) × .46), $165.60 less than the actual award. Given that Davis was ordered to pay $30,773.54 in fees, we conclude that any mathematical error was *de minimis*.

 As the language of the statute makes clear, except when the court has made a finding of absence of substantial justification, in which case a fee and cost award "shall" be made, the decision to make such an award is discretionary, *i.e.*, it "may" be made. Therefore, we review the court's decision for abuse of that discretion. In exercising its discretion, the court must consider and balance the "required considerations" set forth in the statute. *Kierein v. Kierein*, 115 Md.App. 448, 459, 693 A.2d 1157 (1997) (quoting *Lieberman, supra*, 81 Md.App. at 600–01, 568 A.2d 1157). The existence *vel non* of substantial justification within the meaning of FL section 12–103 is a question of law, however, *Peterman v. Peterman*, 14 Md.App. 310, 316, 286 A.2d 812 (1972), and therefore is subject to *de novo* review.

Davis maintains that the court's decision here involved the application and interpretation of statutory and caselaw, and therefore should be reviewed *de novo*, for legal correctness. She advances three arguments to support her contention that fees should not have been awarded: 1) the trial judge failed to consider Davis's substantial justification for bringing the motion to modify custody; 2) the trial judge improperly took into account that Davis was being represented by a "non-profit legal organization"; and 3) the trial judge failed to consider the parties' relative needs.

 We do not find merit in Davis's assertion regarding the standard of review or in any of the three arguments she makes to support her contention that the trial judge's award of fees should be reversed. In making her decision about attorneys' fees, the trial judge was not interpreting the meaning of FL section 12–103; she was applying the statute to the facts of the case. Thus, abuse of discretion is the proper standard of review. Of course, a legal error by the court would constitute an abuse of discretion. *See Waldt v. Univ. of Md. Med. Sys. Corp.*, 181 Md.App. 217, 251, 956 A.2d 223 (2008) (explaining that "it would be an error of law, and therefore an abuse of discretion, for a trial court to permit an expert witness to give testimony that contradicts Maryland

law") (footnote omitted), *aff'd in part and rev'd in part*, 411 Md. 207, 983 A.2d 112 (2009).

We disagree that the trial judge failed to consider Davis's substantial justification for bringing the motion to modify. In acknowledging "the struggle" that any parent would have in believing that his or her child had been sexually abused, the court was taking into account that Davis's pursuit of the motion to modify was not without substantial justification. (Indeed, if the court had found an absence of substantial justification on Davis's part in bringing the motion to modify it would have been required to direct her to pay all of Petito's fees and costs.) The court factored in, however, that there was no evidence that Petito had committed any act of sexual abuse against Sophia, including, as the court had observed earlier in its first memorandum opinion, that Sophia never had identified any act by her father that would constitute sexual abuse; and it then compared whatever justification Davis had had in bringing the motion with what the court found to be a much greater substantial justification Petito had had to defend against it. As the court explained, notwithstanding the absence of factual evidence that he had sexually abused his daughter, without defending himself against the allegations that he had done so, as leveled in the motion to modify, he risked losing his child. A greater loss is difficult to imagine, and, facing that potential, Petito had no choice but to wage an all-out defense. The court thus concluded that Petito's substantial justification for defending himself was paramount and supported an award of fees. In doing so, the court did not ignore the situation in which Davis had found herself when she filed the motion.

We also find no merit in Davis's argument that the trial judge improperly took into account that Davis was being represented by a "non-profit legal organization." The judge considered the amount of legal fees that each party had paid or incurred in deciding whether to make a fee award to Petito and, if so, how much. The only significance the court placed upon the fact that Davis had been represented *pro bono* for

much of the litigation was that it accounted for the amount of fees she had paid or was obligated to pay being substantially lower than what Petito would pay. Without a fee award to Petito, therefore, Davis ultimately would incur $9,153 in legal fees to bring the modification proceeding and Petito would incur $76,052 to defend himself against the proceeding when, in the court's judgment, his justification for doing so was substantial, given the risk of loss he faced and compared to the justification Davis had had in bringing the proceeding. Regardless of whether there was *pro bono* representation for either party, the court did not act improperly by comparing the amount of fees incurred by both parties to the proceeding.

Finally, we are unpersuaded by Davis's assertion that the trial court did not consider the parties' relative needs when making the fee award. The record discloses the contrary. At the same time the court was deciding the fee request, it was deciding the issues of child support and payment for therapy for Sophia. The court had before it the parties' financial information in the form of their monthly incomes and the amounts of attorneys' fees incurred by the parties. The court did not order Davis to pay all of Petito's legal fees. Rather, the court made an equitable decision to allocate the fees that were incurred between the parties based upon their relative incomes, as reflected in the child support worksheet. There is no indication that the court failed to take the parties' needs into account in doing so.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**